IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 10-1362 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| DANIEL CHAPTER ONE, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JAMES FEIJO, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S
REVISED MOTION FOR PRELIMINARY INJUNCTION**

In its memorandum in support of its revised motion for a preliminary injunction,

Plaintiff, the United States Government (hereinafter "the Government"), seeks injunctive relief

enforcing two parts of the Modified Final Order ("Order") issued by the Federal Trade

Commission ("FTC") against Defendants in FTC Docket No. 9329.  First, the Government

seeks an injunction requiring Daniel Chapter One and James Feijo (hereinafter collectively

"DCO") to sign and send a "corrective notice … to past purchasers" of four dietary

supplements, as mandated by Part V.B of the Order.  Second, it seeks injunctive relief

requiring DCO to cease and desist from certain activities allegedly in violation of Part II of the

Order.  *See* Memorandum in Support of United States' Revised Motion for Preliminary

Injunction ("Govt. Memo"), p. 1.

The motion for a preliminary injunction should be denied because the Government has

2

(i) applied the wrong standard governing the issuance of a preliminary injunction, having

mistakenly relied upon 15 U.S.C. section 53(b); and (ii) failed to carry its burden of proof to

support the issuance of a preliminary injunction, under the traditional four-part test governing

such injunctions.[1]

## ARGUMENT

### I.   THE RELAXED STANDARD GOVERNING PRELIMINARY INJUNCTIONS PROVIDED IN SECTION 53(b) DOES NOT APPLY.

Relying on 15 U.S.C. section 53(b), the Government contends that the standard

governing the issuance of a preliminary injunction is **not** the traditional four-part test of:

(1) the likelihood of success on the merits; (2) the irreparable harm to the plaintiff, if the

injunction is not granted; (3) whether the equities, on balance, favor an injunction; and (4) the

public interest.  *See* Govt. Memo, pp. 5-6.  Rather, the Government asserts that section 53(b)

provides for an injunction "[u]pon a proper showing that, weighing the equities and

considering the Commission's likelihood of ultimate success, such action would be in the

public interest."  *Id.*  Thus, the Government claims that, contrary to the ordinary standard

applied to motions for a preliminary injunction, the Government need not show "any

irreparable harm," but only that the injunction would serve the "public interest."  *Id.* at 5.

The Government's reliance on 15 U.S.C. section 53(b), however, is misplaced.

As the Government acknowledges, its motion for a preliminary injunction seeks to

---

[1]   Simultaneously with the filing of this Memorandum, DCO has filed a Motion to Dismiss for lack of subject matter jurisdiction, predicated on the fact that exclusive jurisdiction over the FTC's Order is vested in the United States Court of Appeals for the District of Columbia wherein DCO's Petition for Review is pending.  *See* 15 U.S.C. §§ 45(c) and 45(d).

enforce an FTC **order** to cease and desist certain practices issued by the Commission **after** the FTC has already filed an administrative complaint, conducted a hearing before an Administrative Law Judge, and issued an order pursuant to 15 U.S.C. section 45(b).  *Id.* at 3. On its face, section 53(b) does not apply to the enforcement of an FTC order.  Rather, that section of the FTC Act expressly provides for the issuance of a preliminary injunction "[w]henever the Commission has reason to believe — (1) that any person … or corporation is violating … any **provision of law enforced by the Commission**, **and** (2) that the enjoining thereof **pending the issuance of a complaint** by the Commission.…"  15 U.S.C. § 53(b) (emphasis added).  Under these limited circumstances, Congress has relaxed the standard governing the issuance of a preliminary injunction, "incorporating a unique 'public interest' standard … rather than the more stringent, traditional equity standard for injunctive relief." *See* FTC v. H.J. Heinz Co., 246 F.3d 708, 714 (D.C. Cir. 2001).

The Government has cited no case in which this unique standard has been applied in an action to enforce an FTC order issued after an administrative hearing pursuant to 15 U.S.C. section 45(b), as the FTC is attempting here.  Rather, it has relied on three anti-trust cases, each of which concerned an effort by the FTC to obtain a preliminary injunction pending the filing of a complaint and an administrative hearing.  *See* FTC v. Weyerhaeuser, 665 F.2d 1072, 1073 (D.C. Cir. 1981) ("Invoking … 15 U.S.C. § 53(b), the Commission sought to preserve the status quo pending initiation and completion of administrative proceedings and any judicial review subsequent thereto."); Heinz, 246 F.3d at 710-11, 714; FTC v. Whole Foods Market, Inc., 533 F.3d 869, 873, 875-876 (D.C. Cir. 2008).

Because the Government may not proceed in this case under 15 U.S.C. section 53(b), it

4

must be deemed to be proceeding under 15 U.S.C. section 45(l), as cited in paragraph 1 of its

complaint.  Section 45(l) authorizes the Attorney General, on behalf of the FTC, to seek a civil

penalty of not more than $16,000 for each violation of "an order of the Commission after it

has become final."[2]  "In such actions," section 45(l) further provides that "United States

district courts are empowered to grant mandatory injunctions and such other and further

equitable relief as they deem appropriate in the enforcement of such final orders of the

Commission."  In conferring  such general equitable powers, section 45(l) must be understood

to require the Government's motion for a preliminary injunction to meet the four-part test

usually applied to such motions.

To be sure, the Government also contends that, even under the four-part test, it has

carried its burden to support the granting of a preliminary injunction here.  Govt. Memo, p. 6.

But it has made, at best, only a casual effort to meet that test in its filing, having devoted

almost its entire supporting memorandum to a discussion of the likelihood of success on the

merits, as if that were the only factor before this Court.  *Compare id.* at 12-21 *with id.* at 21-

24.  Indeed, the Government's contentions on the relative equities of the parties and irreparable

harm are lightly treated, as if their resolution were governed by the lower standard governing

---

[2]      In their Memorandum in Support of its Motion to Dismiss for lack of subject
matter jurisdiction, DCO argues that the finality of the FTC order in this case, for the purpose
of applying section 45(l), is determined by 15 U.S.C. section 45(c).  *See* Memorandum of
Points and Authorities in Support of Defendants' Motion to Dismiss Complaint, pp. 8-10.
Since DCO's petition for review is pending in the court of appeals, this Court has no subject
matter jurisdiction, the jurisdiction over the FTC order being exclusively vested in the court of
appeals.  *Id.* at 4-7.

5

preliminary injunctions set out in 15 U.S.C. section 53(b).[3]

Under the general rule that applies in this case, a preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). While the court may evaluate the four factors on a "sliding scale,"[4] the Government must show at least some injury to warrant the preliminary injunction because "the basis for injunctive relief in the federal courts has always been irreparable harm." CityFed Financial Corp. v. Office of Theft Supervisors, 58 F.3d 738, 747 (D.C. Cir. 1995). The Government has failed to meet that heavy burden in this case.

## II.  THE GOVERNMENT HAS FAILED TO CARRY ITS BURDEN TO WARRANT THE ISSUANCE OF A PRELIMINARY INJUNCTION ENFORCING PART V.B OF THE ORDER.

In its supporting memorandum, the Government has devoted a little less than two pages in support of its motion for a preliminary injunction to require DCO to sign and send an FTC-composed letter to all persons who purchased one or more of the four products, the representations as to which the FTC found to be "unsubstantiated," and therefore, "deceptive." See Govt. Memo, pp. 12-13. In these two pages, the Government has addressed only one of the four factors governing the issuance of a preliminary injunction — the likelihood

---

[3]      See Govt. Memo, pp. 22 and 23, where the Government relies upon the Weyerhaeuser and Whole Foods cases, both of which were governed by section 53(b), not section 45(l).

[4]      Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009). But see id., 571 F.3d at 1296 (Kavanaugh, J., concurring) (questioning whether the traditional sliding-scale approach still applies in light of recent decisions by the United States Supreme Court).

of success on the merits.  With respect to the other three factors, the Government's treatment is cursory at best.  It devotes one sentence to the issue whether the public interest requires the sending of the letters (*id.* at 22), two sentences to whether DCO's past customers would be irreparably harmed if the letters are not sent (*id.* at 23-24), and nothing at all respecting the comparative equities of the parties (*id.* at 21-22).  As pointed out below, such scant attention is totally insufficient to carry the Government's burden to warrant the issuance of a preliminary injunction. *See* sections III.D and IV, *infra*.

By giving serious attention only to the question of the likelihood of success on the merits, the Government assumes that the only significant question before this Court is whether, in fact, DCO has sent the FTC-mandated letter within the time period prescribed by Part V.B of the Order.  Yet, the Government well knows that this mandate is being hotly contested by DCO in its petition for review as a violation of DCO's First Amendment rights, as well as in violation of DCO's free exercise of religion under the Religious Freedom Restoration Act ("RFRA"), having been so informed by DCO counsel by letter dated June 4, 2010.  *See* Govt. Memo, p. 13, n.16, Exhibit F.  Should this Court issue the preliminary injunction urged by the Government — while the petition for review is pending — the preliminary injunction would, in effect, **not** be preliminary, but permanent.  In such circumstances, DCO will have been required to perform an irreversible act without regard to a final judicial resolution of the constitutionality or legality of Part V.B, as applied to DCO.  In short, DCO's petition for review would be permanently resolved against it.  The balance of the equities, therefore, weigh

heavily in favor of DCO, not the Government.[5]

Additionally, the Government has made no effort to demonstrate why the mandated letter must be signed and sent within the time period set by the Order.  *See* Govt. Memo, pp. 22-24.  Obviously, it is now already several months after that date, and there is no evidence of any harm.  Indeed, the Government has not even alleged that the purchasers of the four challenged products, to whom the letter must be sent, would suffer irreparable harm if the mandated letter were not sent until after the court of appeals decides DCO's constitutional and legal defenses.  *See id.* at 23-24.  Moreover, if there were any threat of irreparable harm, the Government has offered no reason why the FTC, itself, has not sent the letter.  After all, more than three months ago, DCO submitted to the FTC all the names and addresses of the purchasers of the four challenged products, as mandated by Part V.A of the Order.  As Judge Lamberth of this court has recently reminded us, the movant "must show at least some injury to warrant the preliminary injunction because 'the basis for injunctive relief in the federal courts has always been irreparable harm.'"  Sherley v. Sebelius, Memorandum Opinion, pp. 8-9 (Aug. 23, 2010) (D.D.C., Civ. No. 1:09-cv-1575 (RCL)).

Instead of taking "corrective" action itself to ensure that past purchasers of DCO's products are "fully informed on whether they should continue to use the unproven Products defendants market," lest they be "irreparably harmed," as the Government has contended (*see* Govt. Memo, pp. 23-24), the Government complains that DCO has sent a letter to those

---

[5]     No wonder the Government completely omits any mention of the FTC-mandated letter from its discussion of the relative equities of the parties.  *See* Govt. Memo, pp. 21-22. Instead, it argues that "[b]ecause of the likelihood that the United States will prevail, any arguments defendants may raise are insufficient."  *See id.* at 22.

8

purchasers critical of the FTC — calling DCO's letter "a pre-emptive strike against the FTC [that] would undercut the effectiveness of [an FTC-composed] notice." *See* Govt. Memo, p. 13. But the FTC points to nothing in the Order that prohibited DCO from taking such action to protect its reputation and good will. Indeed, the FTC Order has never been consented to, but vigorously opposed and contested by DCO in a hard-fought adversarial contest.[6] Surely, the FTC is not the helpless giant that it paints itself to be, but has all the resources needed to get its message across to DCO's relatively small group of purchasers, if — as it now contends — such purchasers are being harmed by the delay in sending the required notice.

Finally, the Government erroneously assumes that DCO has no defense in this Court to the FTC's charge regarding DCO's failure to sign and send the letter required by Part V.B of the Order. But DCO does have a defense against the Order under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. section 2000bb-1(c). In pertinent part, that statute states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a … defense in a **judicial proceeding** and obtain appropriate relief from a government."[7] (Emphasis added.) Such a defense comes as no surprise to the

---

[6]     While a letter such as the FTC demands may be suitable in those cases where the order is a product of a consent decree, it makes no sense to impose such a "corrective" measure in a contested case, such as here, whereby DCO is forced to identify itself with the FTC's position in the case, a position that it continues to oppose.

[7]     According to RFRA section 2000bb-2(a) "the term 'government' includes a branch, department [or] agency … of the United States." Thus, RFRA imposes upon the FTC, as well as the United States Department of Justice, a judicially-determined limitation upon the application of FTC's enforcement powers under 15 U.S.C. sections 45(a) to a religious exercise, even if the law being enforced is one of "general application." *See* Gonzales v. O Centro Esperita Beneficente Uniao Do Vegetal, 546 U.S. 418, 434 (2006). *See also* 42 U.S.C. § 2000bb-1.

9

Government.  Indeed,  the June 4, 2010 letter from DCO's counsel to the FTC reminded the

FTC of that defense in response to the FTC's question concerning compliance with Part V.B of

the Order.  *See* Govt. Memo, Exhibit F.  At every stage of the FTC's attack on the DCO

ministry, DCO has pled and offered proof in support of a defense based on RFRA.  Should

DCO's motion to dismiss this case be denied, it will plead RFRA as an affirmative defense.

To that end, James Feijo has submitted a Declaration setting forth how his exercise of religion

would be "substantially burden[ed]" in violation of 42 U.S.C. section 2000bb-1(a) by the letter

mandated by Part V.B of the Order.  *See* James Feijo Declaration ("J.F. Decl."), Exh. 1

hereto, ¶¶ 1, 3-7, 9, 11, 14.

Throughout the FTC administrative proceedings, the FTC attempted to bifurcate DCO

into two parts, one religious and one commercial, and, thereby, to avoid DCO's RFRA

defense.  *See, e.g.,* Opinion of the Commission, FTC Docket No. 9329, p. 24.  Throughout

the entire period covered by the FTC complaint, however, DCO has operated as an integrated

whole, counseling the principles of spiritual and physical wellness in the Kingdom of God

through the teaching of those principles, and the promotion of dietary supplements based on

those principles.[8]  *See* J.F. Decl., Exh. 1, ¶¶ 1, 4-6.  Called by God to a watchman ministry,

DCO warns against the dangers of conventional treatments with toxic pharmaceutical drugs,

while encouraging people to choose natural healing.  *See id.*, ¶¶ 4-6, 12.  The letter mandated

---

[8]     The DCO ministry combining teaching and sales comes within a long-standing American tradition of a "colporteur ministry," including the teaching of Biblical principles on physical health and the sale of books and other materials on "health reform."  *See* E. White, Colporteur Ministry 131 (Pacific Press: 1953) ("True religion and the laws of health go hand in hand.").  *See also* P. Lillback, Sacred Fire 696 (Providence Forum Press: 2006).

by Part V.B of the Order would require DCO to send the FTC's secular scientific message that divorces the spiritual from the physical and affirms conventional medicine.  *See id.*, ¶¶ 9, 11.  To comply with this order would be analogous to forcing Christ's twelve apostles to carry banners containing the message of the Pharisees.  *See id.*, ¶ 11.  This DCO cannot do without breaking covenant with God — whose gifts and calling are irrevocable — and without breaking faith with those who have listened to DCO's message and purchased DCO's products.  *See id.*, ¶¶ 13, 14.

There is, then, no question that the mandated letter places a "substantial burden" on DCO's exercise of religion, as defined in 42 U.S.C. sections 2000bb-2 and 2000cc-5(7), by forcing DCO into engaging in conduct that conflicts with its beliefs.  *See e.g.*, <u>Mack</u> v. <u>O'Leary</u>, 80 F.3d 1175, 1178-79 (7th Cir. 1996).  Upon such a showing, the government must "demonstrate[] that application of the burden to the person … is in furtherance of a compelling government interest … and … is the least restrictive means of furthering that compelling governmental interest."  *See* 42 U.S.C. § 2000bb-1(b).  That burden is a heavy one, and may be shown only by evidence that demonstrates that the requested accommodation — not sending the letter — "would seriously compromise [the FTC's] ability to administer [its] program."  *See* <u>O Centro</u>, 546 U.S. at 435.  Moreover, there is clearly a less restrictive means available — the FTC could send whatever letter it wanted to send to DCO's customers without compromising the FTC's object of getting "corrective information" to those customers so that they can be "fully informed" on whether they should "continue to use the unproven Products defendants market."  *See* Govt. Memo, p. 22.

DCO's RFRA defense seriously weakens the Government's case for a preliminary

injunction enforcing Part V.B of the Order.  On balance, considering the equities of the

parties, the lack of a showing of irreparable harm, and the absence of a clearly defined public

interest in sending out the FTC-mandated letter, the Government has not carried its burden to

justify a preliminary injunction to enforce Part V.B of the Order.

## III.   THE GOVERNMENT HAS FAILED TO CARRY ITS BURDEN TO WARRANT THE ISSUANCE OF A PRELIMINARY INJUNCTION ENFORCING PART II OF THE ORDER.

In its Memorandum in support of its motion for a preliminary injunction, the

Government has identified two specific activities that it believes violate Part II of the FTC

Order — which prohibits DCO from making any "representation[s] … expressly or by

implication, including through the use of product … endorsements that [any of its] product[s]

… prevents, treats, or cures, or assists in the prevention, treatment, or cure of any type of

tumor or cancer." *See* Govt, Memo, pp. 14-21.  Yet, the Government has asked this Court for

a preliminary injunction that sweeps far beyond the activities identified in the Government's

Memorandum.  Indeed, the Government has proposed that this Court issue a preliminary

injunction enjoining any and all violations of Part II of the FTC Order[9] without having placed

before this Court any allegations, much less any proof, that DCO has engaged in allegedly

impermissible activities other than those specifically identified in its Memorandum.  Such a

request would unnecessarily and unreasonably put DCO at risk, not only of future claims of

violation of the FTC Order, but of an Order of this Court.  There is simply no justification for

placing DCO in such dual jeopardy, the Government having proffered no evidence whatsoever

---

[9]     *See* the Government's Proposed Order, pp. 2-3, filed with its motion.

that would indicate that DCO is in comprehensive or flagrant violation of Part II of the Order or that would justify the Government's attempt to obtain such broadside equitable relief.  In fact, just the opposite is the case.

### A.    Background

After receiving copies of the complaint and motion for preliminary injunction in this 7case, Patricia Feijo, the Corporate Secretary of DCO, compiled an extensive inventory of the actions taken to bring DCO into compliance with Parts II and V of the FTC Order (the subject matter of this case) which became effective on April 2, 2010.  *See* Declaration of Patricia Feijo ("P.F. Decl."), Exh. 2 hereto, ¶¶ 1-2.  Indeed, in anticipation that the court of appeals might not grant DCO's motion for an emergency stay, and even before the FTC's order became effective, DCO took steps to distribute broadly information about its products which it would not be able to do after the FTC order became effective.  To get out important health information, DCO created and distributed to anyone who wanted it a Compact Disc called "Vital Health Information the Government Wants To Censor."  However, all distribution of this CD stopped prior to the effective date of the FTC's Order.  P.F. Decl., Exh. 2, ¶ 3.

When the Order became effective on April 2, 2010, DCO took the following actions to comply with the FTC Order, as detailed by Mrs. Feijo's Declaration:

A.    **DCO Product Information Impounded**.  We identified those DCO materials which we believed the FTC Order prohibited from being distributed to the public.  We then went through the DCO offices collecting all copies of all such documents.  We placed all copies that we could find in boxes, sealed the boxes, marked "Censored" on the boxes, and locked the boxes in an outside shed at the DCO Rhode Island office.  When copies of these DCO documents have been requested, DCO has advised people that it is no longer able to distribute them because of the FTC's Order.…  These materials include, but are not limited to, the following DCO product information:

13

1.      Literature
2.      Posters
3.      Product flyers
4.      Information sheet on Ezekiel oil
5.      Information sheet on Genesis oil
6.      Product Descriptions
7.      CDS "Vital Health Information The Government Wants To Censor"
8.      Cancer Newsletter
9.      CDS on Health Freedom
10.     BioGuides

B.      **DCO Blog Suspended**.  To be completely safe, DCO took down in its entirety its Internet blog, http://teamdc1news.blogspot.com/.  This blog had contained product information and many testimonials about how DCO products helped people.  Its removal can be verified by clicking the link above….

C.      **DCO Website Sanitized**.  DCO took down any product information that it thought violated the FTC order from its website, http://www.danielchapterone.com/.  DCO took down testimonies from people who had been helped by its products.  DCO removed links to the DCO Cancer Newsletter.  DCO blacked out any portions of the product descriptions that stated how these products could help people, including its on-line store.  This required a tremendous amount of time and work.

D.      **DCO Product Labels and Inserts Changed**.  DCO could not send out product without labels, so DCO set about the enormous job of drafting new labels for each of its products that would comply with the FTC order.  DCO stopped providing informational sheets on Ezekiel oil and Genesis oil when orders are mailed out.  Large portions of text were censored/redacted on a LOT of copy on the websites.

E.      **DCO HealthWatch Radio Program Completely Revised**.  DCO's daily radio show was made, as we called it, "April 1st Compliant" (known at DCO as "A1C").  DCO worked with Accent Radio Network ("ARN") to restructure the DCOHealthWatch radio show to comply with the FTC order.  To distinguish the new show, we called it **Daniel Chapter One Censored**.  That included making changes in music, elements, content, updates on the litigation against DCO, discussion of the risks of chemotherapy and radiation, spiritual counseling, etc.  Both my husband Jim and I stopped answering health questions by giving any information about products that could violate the FTC Order….  Even when asked directly, we refuse to provide such information.

F.      **DCO Developed New Post-Gag DC1 Advertising Guidelines.**  DCO worked

with Accent Radio Network ("ARN") to create the Post Gag DC1 Advertising Guidelines.  The DCO Healthwatch Radio Program regularly used ads for its products which we were afraid the FTC Order precluded.  All such ads were reviewed, and as of April 1, 2010, we removed nearly all radio ads, and replaced them with new ones that were A1C.

G.    **Removal of DCO Healthwatch Radio Archives**.  DCO requested ARN to take down from the network's online archives all previous programs that aired before April 1, 2010, and ARN complied with this request.  These radio archives are unavailable to the public.…

H.    **Change of DCO Policy for Taped Shows**.  When my husband or I could not do a live show, it had been our practice to air the tape of a prior show.  This practice ended on April 2, 2010, so that any statements we made before April 1, 2010, could not be held against us as if we had made them after April 1, 2010.  This has created substantial difficulties for DCO.  Programs that were rebroadcast on a day when we could not do the program were carefully clipped and edited to be A1C.  As a result, DCO has never aired an unedited pre-April 1st Healthwatch radio program since then, except for a Dr. Maclean broadcast, which was edited to be A1C.

I.    **Creation of DCO Fellowship.** …. Understanding that the FTC's  Complaint Counsel was objecting only to DCO's information being on a website where access was not limited to members of their Christian church or fellowship, as well as the ALJ's similar concern, DCO created the DCO Fellowship to allow people to self-identify with and become members of the DCO ministry.  Only members of the DCO fellowship can have access to **certain product information**.  http://dc1fellowship.com/….  Since April 1, 2010, only about **200 people** have joined the DCO Fellowship.  When a person joins the DCO Fellowship, he or she can make a posting on the on-line forum.  Some postings are requests for prayer and some about health problems.  Each member of the Fellowship can view the postings and respond to those postings.  As Fellowship members, one can request to become a Global Moderator who helps answer questions and moderate the discussion.  Although product information is not offered, in a few cases specific requests have been made by members for specific DCO product literature.  Such otherwise-embargoed BioGuides and Most Simple Guides have been provided to **20 DCO Fellowship members only**….

J.    **Radio Show Testimonials**.  [O]n the radio, when questions are posed that Jim and I cannot respond to under the injunction, the Holy Spirit sometimes leads others to call to share testimonials as to what they did and how it worked.  On other occasions, there are no such responses, and we just go on to the next

caller.…  Such calls are not the work of DCO employees or persons who
receive payments of free product from DCO.  DCO does not put people up to
make any endorsements .…  However, our radio show allows people to share
their personal testimonies — about God and about matters of health.…

K.  **Censoring DCO Counseling Ministry**.  Not only did my husband and I and all
who work with DCO stop providing DCO product information on the radio
program, we stopped answering health questions by phone, by email, in person,
and in public.  We also directed those who work with DCO to stop answering
product questions by phone, by email, in person, and in public.

L.  **Suspend all DCO Public Appearances**.  So that we would not be placed in a
situation where people would ask us to help them with their illnesses or the
illnesses of their family members and friends, and we would have go through
the process of telling them that we could not help them, we stopped scheduling
all public appearances, health seminars, and even stopped conducting live
remote radio broadcasts.

M.  **Suspended Homeopathic Counseling**.  Although I am a trained homeopath, I
use nutritional counseling with my homeopathy; I have not felt at liberty to
work with people to comply with the FTC Order.  I would rather they call a
homeopath who was not shackled as I am during this period to give my best
judgment.…

N.  **Turned Over DCO Customer List Under Protest.**  We turned over the
customer list as ordered by the FTC in Paragraph V.A of the Order, under
duress and protest.  DCO does not market its products as others do, and does
not do mailings as others do, and we do not have in-house computer staff.
Putting the DCO customer list together so that it could be submitted required
DCO to employ a computer technician and others to spend days to access this
information.  We believed that the FTC had no right to invade the privacy
interests of DCO and those who purchased its products; however, we trusted
that the FTC would be responsible and keep this list confidential.…
[*See* P.F. Decl., Exh. 2, ¶ 4.]

Of these 14 separate actions taken by DCO to comply with the Order, the Government

has challenged only two that implicate a possible violation of Part II of the Order:  (1) the

Radio Show Testimonials, and (2) the DCO Fellowship.  For that reason alone, the

Government has not carried its burden to demonstrate that its request for a preliminary

injunction enforcing Part II in its entirety is justified.  Nor has it met that burden with respect

to the two actions that it does challenge in this case.

**B.      Radio Show Testimonials**

The Government claims that the testimonials "solicited" by the Fiejos on the radio are

"endorsements," as defined by 16 C.F.R. section 255.0(b) and as forbidden by the Order.  *See*

Govt. Memo, pp. 14-15.  According to the FTC guide, "an endorsement means any

advertising message … that consumers are likely to believe reflects the opinions, beliefs,

findings, or experiences of a party other than the sponsoring advertiser, even if the views

expressed by that  party are identical to those of the sponsoring advertiser."  Totally absent

from the Government's memorandum is any analysis showing why the spontaneous

"testimonials" at issue are "endorsements."  Rather, the Government simply states that they

are and that this Court should take the Government's word for it.  *See* Govt. Memo, pp. 15-

16.  To be an "endorsement," under the FTC's own definition, there must be a "sponsoring

advertiser."  Otherwise, there is nothing for the testifier to "endorse."  In the case of the DCO

radio testimonials, there is no such "advertiser."  Nor is there a "sponsor."  Instead, the

testimonies are forthcoming on a completely voluntary basis.  As Mrs. Feijo has explained in

her Declaration:

> [W]hen questions are posed that Jim and I cannot respond to under the
> injunction, the Holy Spirit sometimes leads others to call to share testimonials as
> to what they did and how it worked.  On other occasions, there are no such
> responses, and we simply go on to the next caller.  When people call in to offer
> their life stories about the power of God and how he worked in their lives,
> sometimes by the use of dietary supplements, God is in control.  Such calls are
> not the work of DCO employees or persons who receive payment or free
> product from DCO.  DCO does not put people up to make any endorsements
> which is prohibited by the FTC Order.  However, our radio show allows people

to share their personal testimonies — about God and about matters of health. [P.F. Decl., Exh. 2, ¶ 4.J.]

Remarkably, the Government admits that it had no idea what the "connection" was between DCO and those calling in.  And, it never asked DCO.  Instead, the Government has confessed its ignorance that the "prohibited representations are made by individuals whose connection to defendants is unknown."  Govt. Memo, p. 15.  By its own definition of "endorsement," however, the Government would have to know the "connection" in order to determine whether any particular representation was "prohibited."  In its zeal to bring this enforcement action, the Government failed to conduct an appropriate investigation.

C.     The DCO Fellowship

Apparently, the Government also failed to investigate carefully the "online forum" and the work of the "Global Moderators" before concluding that the activities that they singled out were in violation of the Order.  As was the case with the radio testimonials, the Government conceded that "the connection between the Global Moderators on defendants' online forum and defendants is unknown."  *See* Govt. Memo, p. 19 n.19.  Had the Government undertaken to find out, it would have discovered that both the forum and the moderators are part of the newly- created DCO Fellowship.  *See* P.F. Decl., Exh. 2, ¶ 4.I.  And that fellowship was birthed by the Lord in response to DCO's understanding, based on statements of the FTC's Administrative Law Judge and Complaint Counsel, that the FTC's concerns sprang from DCO's representations about their dietary supplement products to the public generally, not to people who were part of DCO's Christian ministry.  *Id.*  By creating DCO Fellowship, and limiting it to persons who "self-identify with and become members of the DCO ministry,"

18

DCO believed that it was in compliance with the Order.  *Id.*  As Mrs. Feijo explains it in her

Declaration:

> I want to stress this was not our idea.  We never felt led to collect the names of
> people who were involved with our ministry, or to assemble people in this form.
> We believe that the Lord Himself brings together those whom He wishes.  We
> took this step because we felt it necessary to comply with the FTC's order to
> share product information within our ministry.  There have been occasions when
> we have been asked for product information, and we refused to provide it,
> suggesting that the person could join the DCO Fellowship.  Sometimes, we were
> told that the person had no interest in becoming a member of our Fellowship,
> and we told them, in that case, we could give them no product information.
> [*Id.*]

According to the FTC Order, Part II reaches activities "in or affecting commerce."  It

is DCO's position that the DCO Fellowship activities identified in the Government's complaint

and memorandum in support of the motion for a preliminary injunction are neither "in

commerce" nor "affecting commerce," but religious in nature and purpose and, therefore,

outside the scope of the FTC Order.  *See* P.F. Decl., Exh. 2, ¶ 4.I.

Contrary to the assertions of the Government, then, there appear to be serious doubts

about the Government's ability to prove that DCO has violated the Order, and that the

Government will succeed on the merits of its claim against the DCO ministry.  There are also

serious doubts whether the Government has carried its burden respecting the relative equities

of the parties, the public interest, and — most especially — any irreparable harm if the

Government's motion is not granted.

**D.     The Equities, Public Interest and Irreparable Harm**

Although Part II of the Order prohibits DCO from making any representation about its

products unless the representation is "true and nonmisleading," the Government has neither

alleged nor attempted to marshal any proof that the challenged representations violate that part of the Order.  Rather, the Government has alleged only that DCO has violated the Part II of the Order by failing to "substantiate" its product representation by "competent and reliable scientific evidence."  *See* Govt. Memo, p. 1.  Indeed, the Government's allegations in this case are necessarily so limited because the Order, itself, was never based on any finding that DCO's product representations were, in fact, false or even actually misleading[10], but determined only that they were "unsubstantiated" by what the FTC deems to be "competent and reliable scientific evidence."  *See id.* at 2-4.  Despite this clear record, the Government contends that this Court should grant its motion for a preliminary injunction because "[t]he public interest is served when consumers are protected from being deceived by **false** representations related to untested therapies."  Govt. Memo, p. 23 (emphasis added).  This Government claim should be rejected.

Although the FTC Order purports to define "competent and reliable scientific evidence," that definition gives way to the FTC's unilateral discretion to decide whether the evidence is "based on the experience of professionals in the area," whether it is has been "evaluated by persons qualified to do so," and whether it was subject to "procedures generally accepted in the profession."  *See* Govt. Memo, Exhibit A (Modified Final Order, Part I.A).  In the exercise of its discretion in DCO's case, the FTC determined that, because DCO's representations were cancer- or tumor-related, the only scientific evidence acceptable to it must come from "controlled clinical studies" of the kind that the Federal Drug Administration

---

[10]     Nor was the complaint ever based upon any allegation that any DCO product caused any harm.

20

utilizes to approve new pharmaceutical drugs.[11]  *See* Commission Opinion, FTC Docket No.

9329, pp. 18-22.[12]  Thus, the FTC disqualified DCO's experts, throwing out their testimony

attesting the efficacy of DCO products in the treatment of cancer and tumors.  Furthermore,

the FTC disregarded the personal testimonies of the efficacy of DCO products, even though

health care practitioners regularly rely on testimonials to determine what works.  *See*

Declaration of Tedd Koren ("Koren Decl."), Exh. 4, ¶¶ 1-3.

Just because DCO may not be able to "substantiate" its claims by evidence acceptable

to the FTC does not mean that its claims are not scientific or reasonable.  Indeed, at the

administrative hearing before the FTC, two expert witnesses — one, a licensed naturopathic

physician, and another, a Ph.D. botanist expert in herbal medicinal plants — furnished expert

reports in which, after researching relevant studies, papers, reports and books in their fields of

expertise, they concluded that there was a reasonable basis for DCO's cancer-treatment

statements with respect to the four products challenged by the FTC.  And they have submitted

parallel testimony in this case.  *See* Declaration of Sally LaMont ("LaMont Decl."), Exh. 5,

¶¶ 1, 3, 6-9; Declaration of James A. Duke ("Duke Decl."), Exh. 6, ¶¶ 1-7.  Both experts

also opined that the American people should not be denied access to natural healing products

---

[11]      Apparently, the FTC would deep-six the Congressional finding in the Dietary
Supplement and Health Education Act (DSHEA) which states that "the importance of nutrition
and the benefits of dietary supplements to health promotion and disease prevention have been
documented increasingly in scientific studies" and "there is a link between ingestion of certain
nutrients or dietary supplements and the prevention of chronic diseases such as cancer…."
Sections 2(2) and (3)(A) of DSHEA of 1994.

[12]      *See also,* Brief of Petitioners, pp. 5-6, 49-53, filed in DCO v. FTC, U.S. Court
of Appeals for the District of Columbia Circuit No. 10-1064, and attached hereto as Exh. 3.

because such products have not been tested in the same way as pharmaceutical drugs, tests that are neither suitable nor financial feasible.  Duke Decl. ¶ 8; LaMont Decl. ¶¶ 9-10.  Indeed, Dr. LaMont testified that she utilizes a variety of nutritional supplements, botanical medicine, and mind-body treatments in her practice, including providing health care advice and treatment to patients undergoing conventional cancer treatment.  LaMont Decl. ¶¶ 3, 5.

Not only are nutritional supplements and herbal medicines complementary to conventional treatments, but they serve as an alternative — and sometimes the only — means available to meet an individual need whether after chemo- and radiation has failed and the patient sent home to die, or before, such as was the case of the son of a Doctor of Chiropractic whose very life was saved through the use of DCO products, and whose full recovery may very well depend on continued access to DCO products and counsel.  Koren Decl., Exh. 4, ¶¶ 5-24.  While this may be one man's testimony, there are many others who would similarly swear by DCO products.  *See, e.g.,* Declaration of Karen S. Orr ("Orr Decl."), Exh. 7, ¶¶ 3-6; and Declaration of Deane Mink ("Mink Decl."), Exh. 8, ¶¶ 4-6, 8.

If there is any serious risk of harm here, it would arise from a decision to grant the Government's motion which would deprive many people access to DCO products that have saved lives, not destroyed them.  *See* Koren Decl., Exh. 4, ¶¶ 23-24; Orr Decl., Exh. 7, ¶ 9; Mink Decl., Exh. 8, ¶ 8.

While there is solid evidence of efficacy, there is no evidence whatsoever that DCO's products are unsafe.  DCO can provide hundreds of testimonies of the beneficial effects of its products, but has never received even one complaint from someone harmed by any such product.  P.F. Decl., Exh. 2, ¶ 14.  *See also* Mink Decl. ¶ 6; Orr Decl. ¶ 6.  Products such as

those developed and promoted by DCO are composed of natural ingredients that have been used for millennia without evidence of serious harm.  LaMont Decl., Exh. 5, ¶ 11.  Not surprisingly, the FTC never charged in its original complaint that DCO's products were unsafe.  *See* Govt. Memo, p. 2.  Yet in the memorandum supporting its motion for a preliminary injunction, the Government asserts, without any evidentiary support whatsoever, claims such as:

- "The very real, imminent, and substantial harms that cancer patients face as a result of defendants' misleading claims outweigh any equities that defendants may claim support their position."  Govt. Memo, p. 21.

- "There is great public interest in preventing the harm that results when consumers forego beneficial and effective therapy for untested therapies such as those defendants promote."  *Id.*, p. 22.

- "There is great public interest in preventing the harm that arises when consumers risk their health to potential side effects and harmful interactions between the Products and other therapies."  *Id.*

- "Irreparable harm arises if consumers forego beneficial and effective therapy for untested therapies such as those defendants promote."  *Id.*, p. 24.

- "Irreparable harm arises when consumers risk their health to potential side effects and harmful interactions between the Products and other therapies."  *Id.*

In contrast to the Government's hackneyed platitudes, DCO has offered — by sworn declarations — concrete evidence of the efficacy and safety of DCO products.

**IV.   THE GOVERNMENT HAS FAILED TO SATISFY THE STANDARDS NECESSARY FOR ISSUANCE OF A PRELIMINARY INJUNCTION.**

The Government has failed to make the necessary showing on every single element that it is required to prove in this Circuit to obtain the preliminary injunctive relief it has requested. With a repetitive cry of "irreparable injury" that it has manufactured from pure conjecture, the Government is attempting to steam roll the Defendants by labeling their admitted conduct as somehow injurious to the public interest, without any proof of injury whatsoever.

To obtain such injunctive relief, the Government must not only demonstrate (i) the likelihood that it will prevail in proving that Defendants violated the Order and are subject to penalties for their conduct, but also (ii) that the Government or the public will suffer irreparable injury if such an injunction is not issued, that (iii) the relative equities between the parties favor the granting of such relief; and (iv) that such relief is in the public interest.  In order to obtain preliminary injunctive relief, the Government must make a substantial showing on these traditional factors.  *See, e.g.*, Davis v. Pension Benefit Guaranty Corp., 571 F.3d at 1291-92; Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  Moreover, as indicated above (page 5 n.4, *supra*), plaintiff may no longer be able to rely on the traditional "sliding-scale" approach in meeting its burden, *see* Sanofi-Aventis U.S. LLC v. FDA, 2010 U.S. Dist. LEXIS 87583, pp. *11-*14 and n.5 (D.D.C. 2010), in light of recent decisions by the Supreme Court.  *See, e.g.,* Winter v. Natural Resources Defense Council, 555 U.S. ___, 129 S.Ct. 365, 375-77 (2008).  A preliminary injunction is an extraordinary remedy, and should not be awarded if the proponent has not carried its burden of persuasion by a clear showing.  Cobell v. Norton, 391 F.3d at 258.  Having failed to do so,

the Government is not entitled to an injunction in this case.

Without substantial proof that Defendants' conduct is illegal, the Government cannot possibly hope to obtain the injunctive relief it requests.  As discussed in Parts II and III above, the Defendants have significant defenses to the Government's charges.  There is no hidden conduct or covert attempt to thwart the FTC Order, as is implied in the Government's supporting memorandum.  The Government is now rushing to this Court[13] — four months after the Order became effective, and at least three months after it had the very evidence on which it now relies — and claiming that the public will suffer irreparable injury because the Defendants have not yet sent a FTC-mandated letter to former customers and because DCO is involved in a radio show call-in and a website on which members of a Christian fellowship are free to speak about their own health-related experiences.  With all due respect, the Government's claim of substantial harm and irreparable injury is mere conjecture.  There is, in fact, no conduct here that warrants the issuance of a preliminary injunction.

---

[13]     Before filing this 15 U.S.C. section 45(l) enforcement action, the FTC never contacted DCO about its belief that the actions specified in its complaint violated Part II of the Order.  In a  1968 case cited by the Government in its memorandum (Govt. Memo, p. 8), a district court made this observation: "[A]s the Court reads the provisions of 15 U.S.C. § 45(l) in conjunction with the rules and regulations of the Federal Trade Commission, the Commission has an obligation to determine and to inform parties whether and to what extent their conduct may be in violation of a cease and desist order.  It is only after the Commission has made such a finding that the penalties contemplated by 15 U.S.C. 45(l) could be assessed, and only from that day forward.  Any other interpretation of the statute and regulations would raise serious questions of due process."  Continental Baking Co. v. Dixon, 283 F. Supp. 285, 287-88 (D. Del. 1968).

25

## CONCLUSION

For the reasons stated above, and for those stated in the Defendants' Motion to Dismiss Complaint herein, the United States' Revised Motion for a Preliminary Injunction should be denied.

Respectfully submitted,

_\_\_\_/s/ William J. Olson_____
William J. Olson (D.C. Bar No. 233833)


_____
John S. Miles (D.C. Bar No. 166751)


_____
Herbert W. Titus
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Suite 4
Vienna, Virginia  22180-5615
(703) 356-5070
Attorneys for Defendants