IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DANIEL CHAPTER ONE, )<br>)<br>and )<br>)<br>JAMES FEIJO, )<br>)<br>Defendants. )<br>) | Civil No. 10-1362 (EGS) |

### DECLARATION OF TEDD KOREN

1. My name is Tedd Koren. I earned a B.A. Degree from the University of Miami in June 1972, and the Doctor of Chiropractic (D.C.) degree from Sherman College of Straight Chiropractic in Spartanburg, S.C. in 1977. I have been in the private practice of chiropractic in Pennsylvania since 1977. My chiropractic office is located at 301 Wood Spring Road, Gwynedd Valley, PA. Additionally, I am the Founder and President of Koren Publications, Inc., which has distributed over 60 million pieces of literature on chiropractic worldwide. I also serve as President of Foundation for Health Choice, a nonprofit organization devoted to advancing the rights of patients and their families to choice, information, safety and redress in healthcare. I have taught at several schools of chiropractic, worldwide, as well as many continuing education programs. My curriculm vitae can be found at http://www.teddkoren.com/tedds-cv/

2

2. I offer this declaration in support of Daniel Chapter One ("DCO") in its effort to defend against an enforcement action brought against it by the federal government and to explain the significant interest that families have in keeping the channels of communication open about alternative medical care and treatment that the FTC is attempting to close. (I should mention at the outset that I am no stranger to the FTC's continuing efforts against alternative medicine. The FTC investigated my chiropractic practice and my firm Koren Publications over a six-year period, and dropped its investigation, making no charges, in June 2001.)

3. I understand that the FTC has embraced the position taken by an oncologist expert witness against DCO that testimonials are an unreliable form of medical evidence. This is foolishness. Good health care practitioners regularly rely on testimonial evidence. Indeed, all good science is based on observation. From observation, one finds correlation. Testimonial evidence helps us understand correlation. From correlation, one determines causality. A clinical trial of a pharmaceutical drug is little more than a standardized collection of testimonials — but can be less reliable, as it is often subject to manipulation. For example, in conducting a clinical trial, those patients who are made so sick by the drug that they cannot continue the protocol are generally excluded from the study rather then being counted as a failure, skewing the result in favor of the drug being tested. Clinical trials which find pharmaceutical drugs toxic or ineffective may never see the light of day. Peer-reviewed medical journals appear to be heavily influenced by their biggest advertisers — pharmaceutical companies. Recently, peer-reviewed medical journals have been embarrassed by revelations that articles have not been written by the Medical Doctors whose name appears on them, but

3

ghost written by representatives of pharmaceutical companies. It is a little known fact that few chemotherapy drugs ever have been subject to double blind, randomized, placebo-controlled, clinical trials — as they are regularly tested only against other radiation and chemotherapy approaches. On the other hand, testimonials are a type of clinical study, where n=1, where the reliability of the reaction of the patient can be tested and evaluated. When health care practitioners listen to their patients, they are listening to testimonial evidence. Clinicians and researchers both use testimonial evidence on a daily basis. They want feedback to find out what works, and they adjust their treatment protocols based on what they observe in their own practice — not just what they read in a medical journal. No good scientist would disparage the importance of testimonial evidence.

This is evidenced where the FDA permits "off label" use of an approved drug. While there is no evidence that a drug is useful for an unapproved condition, the FDA permits doctors to use it in a tried-and-true "testimonial" or empirical approach to healthcare. Indeed, it is often in this way that new approaches to drug therapy are discovered. Why non-FDA clinical trial approved uses for toxic drugs is permitted and non-FDA clinical trial approved uses for medicinal herbs is disparaged is unknown to me (especially when the product in question has been deemed safe from thousands of years use in herbal medicine.)

Further, the standards of the Controlled Clinical Trial (CCT) are designed to give the response to "average" populations. As A.B. Hill, the British statistician who developed the CCT, stated, "The controlled clinical trial does not tell the health care provider what he needs to know — how will this drug affect the patient before him." The CCT, however, on which the FDA relies exclusively, establishes no more than averages. On the other hand, a

4

testimonial tells the physician what happened in each particular case — a case study. Reviewing several case studies can be far more valuable to a health care provider than looking at a graph or chart reporting averages in a medical journal. *See generally* Harris L. Coulter, Ph.D., The Controlled Clinical Trial – An Analysis (Center for Empirical Medicine, Aug. 1991).

4. I have heard it said that physicians today, educated at medical schools where the curriculum is heavily influenced by pharmaceutical interests, are best described as clinicians, not scientists. All too often they observe a pattern of symptoms, order a couple of tests, and write a script for a toxic pharmaceutical drug. Frequently, physicians treats symptoms, not the complex, individualized, causes of the problem generating those symptoms. More often than not, dietary needs are disregarded. Physicians frequently have no knowledge of herbal alternatives to toxic drugs. Frequently, they have even less curiosity than knowledge about alternatives. Patients should not view medical doctors as though they are omniscient scientists, when they are never omniscient, and often do not behave as scientists. Patients must retain control of their own health care — and parents must retain control of the health care of their children. Patients need sources of information about alternatives to chemotherapy and radiation of the sort provided by Daniel Chapter One, and the testimonials of those who use their products. The government should not act to stifle the sharing of testimonial evidence.

5. To illustrate my point about surrendering one's judgment and freedom of choice to the collective wisdom of the allopathic medical community, I offer the Court my own testimonial — not about a patient — but about my very own son, who last year was diagnosed with intracranial germinomas — tumors on the brain. In this testimonial, I have included

statements from the oncologists and others which appear below in quotation marks. While I do not have the exact words used by these persons, I believe that the quotations that appear below fairly reflect the substance of their statements. I hope this testimonial provides the Court with insight into the world of oncology, the supposed medical science that undergirds it, and why the free flow of information about health care issues is vital to a healthy public.

6. In early September 2009, my 17-year old son Seth had an MRI, and a neuro-radiologist diagnosed brain tumors in his pituitary and pineal. The tumors were affecting his neurotransmitters and disrupting hormone production, resulting in symptoms such as lack of growth, constant thirst, frequent urination (diabetes insipidus), etc. This diagnosis turned our lives upside down. We felt lost, powerless, confused, not knowing where to turn. How could this happen to our son?

7. Seth was seen by an oncologist, a neurosurgeon and a pediatric endocrinologist at St. Christopher's Hospital in Philadelphia, and at Children's Hospital of Pennsylvania ("CHOP"). We were told that Seth's prognosis was beyond grim — unless we followed their procedures. Their message was as follows: "These tumors are most likely germinomas, cells that did not properly differentiate in fetal development. Once they are diagnosed they tend to grow rapidly and could spread throughout his brain and to his spinal cord. Since intracranial germinomas are sensitive to radiation, we recommend immediate radiation therapy and possible brain surgery. We can start right away."

8. The oncologist said, "If you don't do the radiation right away the tumors could spread from his pituitary to his optic chiasm and he'll begin to lose vision and might go blind

6

soon." I asked if there were any non-radiation approaches. I was told "Nothing else would work. No alternative care can work."

9. My wife Beth and I, consulting with Seth, refused to rush into radiation and surgery, telling them it is our "last resort" not our "first resort." We needed to look at other options. In the course of the conversation Beth mentioned to the MDs at St Christopher's that as a family we generally preferred to use natural healthcare for our healthcare needs. The oncologist and endocrinologist expressed disapproval at hearing that. One of the MDs called in Child Protective Services, accusing Beth and me of "medical neglect" of our son Seth for failure to immediately agree to what the oncologists wanted us to do. We were told that if found guilty, the court had the power to forcibly remove Seth from us and force him to have medical treatments against our will and his will.

10. With all the fear, anxiety and terror we were suffering over Seth's tumors, we didn't need threats of this sort on top of it all. I could barely think straight. While I was out of town, two case workers came to our home to investigate our family for abuse. They spoke to both Seth and our daughter privately, apart from Beth, and also interviewed Beth. I met with a case worker a couple of weeks later who all but demanded Seth get yet another MRI right away. The implied threat of "Or else" was hard to avoid.

11. Fortunately, it was close enough to Seth's 18th birthday, and child protective services has no jurisdiction over anyone 18 and older. We had to wait them out. So our family worked with the case officers, had the interviews, had the medical meetings at CHOP and, at their insistence, had another MRI at CHOP — against my best judgment. "Do the MRI," the case worker told me.

12. At my last meeting with the caseworker, I said to her that I understood that we would have 45 days to appeal any decision. She knew where I was heading and understood that Seth would be 18 by the time the appeal process continued. "I hope you know what you're doing," the caseworker said to me, "How would you feel if he's gone blind in February?" Obviously she was parroting what the medical doctors were telling her.

13. During this time, we investigated alternatives. The case worker stated that we had to seek help from medical doctors to demonstrate that we weren't medically negligent. Non-physicians weren't acceptable. We visited with a pediatric oncologist at CHOP in November who repeated what earlier physicians stated, warning us that the tumors might metastasize to his spinal cord. I believe there was an effort to fill us with fear, to get us to do what the oncologists wanted us to do. "If that happens we should consider chemotherapy with MRIs every three months, plus immediate radiation therapy. We could begin the radiation in a few weeks. He could go to radiology in the morning and go to school afterwards."

14. We asked about the side effects of radiation. We were told "radiation might cause Seth to lose a few IQ points." A few IQ points? I reviewed the medical literature and it demonstrated that radiation of the brain can cause permanent brain damage, leaving the person with low function. Then we were told "Oh, radiation also has a risk of causing brain cancer," but they played down the risk.

15. Meanwhile Seth was less than a month away from his birthday. The case worker finally decided that lo and behold, we were not medically abusive (negligent) parents. She ended our conversation with these words I'll never forget, "If only I had gotten to you a year earlier, then Seth would be getting the care he needs."

8

16. Another Medical Doctor suggested we explore "Gamma knife radiation", saying he knew a famous brain surgeon. "The good thing about brain surgery is that you know all the side effects right away," he said. "They won't drill into his skull, they'll go through his nose" he said somehow thinking that that would be comforting to us.

17. We were afraid not to go the conventional route, but based on our study, much prayer, and research as a family we made the decision to refuse toxic and dangerous chemotherapy and radiation. Of the people most supportive of our family during this difficult period were the folks at Daniel Chapter One. We worked closely with Daniel Chapter One and particularly Tricia Feijo to determine what Seth should take to strengthen his body's ability to fight back, the way that God designed it to work. We also used a variety of alternative approaches, such as homeopathy, but with respect to nutritional supplements and herbal remedies, Seth consumed large quantities of three Daniel Chapter One products — 7-Herb Formula, Bio-Shark, and GDU — which is not a problem, because they are not toxic. On January 21, 2010, Seth turned 18 years of age, and Child Protective Services withdrew. We were free to make our own choices without government control and coercion.

18. About 10 months after Seth's first MRI, we had a follow-up MRI done on July 21, 2010 to check the condition of the tumor. Seth had to have blood work to have the MRI (because of the contrast medium). The blood work showed that Seth's hormone levels had improved, some key hormones saw a 10-fold increase. We received the report of the MRI the next morning. The radiologist who had read the first set of films in September said there was "no change" since then. There was no infiltration into his pituitary and no growth of the tumor. Frankly, we were happy to see that the tumors had not grown, but Seth was badly

disappointed. After all the alternatives used, Seth was really disappointed the tumors had not gotten smaller. However there were positive signs, as, for example, Seth had grown over 1 and 1/4 inches since December.

19. I brought Seth's films to another neuro-radiologist for a second opinion at another Pennsylvania Hospital. Would he confirm the first findings? Would he find the tumors have grown, shrunk? I didn't know. I found him in the "reading room." A dark room with computer screens. Radiologists sit in front of them all day long - by themselves. He seemed happy to have company. I held my breath as I handed him the two CDs from the first radiologist. He looked at both sets of MRIs and here is the substance of our conversation.

He said, "What a difference in the films!"

"What kind of difference?" I asked, my heart pounding.

"The tumors are much smaller. They have shrunk by at least 75%."

"Are you sure?"

"Yes, yes, it's quite obvious. Big improvement."

"Why did another radiologist say there was no change?" I asked.

"I can't answer for what another radiologist says," he told me.

I left that hospital feeling a relief all over my body. Stress that I'd held for 9 months was beginning to melt. I ran home and called Beth who was in Israel with my daughter. It was midnight there, and I woke her up when I called to tell her the news. Beth was thrilled, but said "I think you should get another opinion — just to be sure."


10

20. I did. I called another Pennsylvania Hospital and was told me to come in. Another lonely radiologist in a darkened room with computer screens was happy to have company. I held my breath as he read the films.

Would the prior reading have been a mistake?

"A lot of shrinkage here. What did you do to make these changes?" he asked.

I told him "We used classical homeopathy, herbs, dietary supplements, acupuncture and some other things."

His one word response was music to my ears — "Sweet."

He added: "There's almost nothing by the pineal and the pituitary tumor is much smaller, around 80% smaller," he said.

"Thank you," I told him as I was leaving. "You've made some people very happy."

21. I spoke to the Executive Director of the company that did the first reading, and told him that two independent radiologists saw dramatic changes in the second MRI, while his doctor saw no change. I asked for his radiologist to check out the films again. He was very defensive. "Did you get a written report?" he asked me. "No, I sat with them as they read the films." He said he'd have the radiologist call, but no one called. Eventually, the first radiologist called and said there was some problem with his computer the day he looked at Seth's MRI, and he accidentally read the same report twice — hence he saw no change. He said he would send an amended report showing that the linear dimensions of the tumor/growth near the pituitary decreased by 40-50 percent while the volume of the tumor decreased by around 80 percent. The pineal tumor is practically all gone. "This is a dramatic improvement. The lesion has shrunk by 80 percent in volume. This is a significant decrease," he said.

22. When I received his revised report it stated:

"ADDENDUM: The report of 7-21-10 indicates an enhancing lesion within the hypothalamus and within the region of the pineal gland. This study is compared to an examination performed at this center on 9-25-09. The study performed recently shows less motion artifacts but direct measurements show a **significant decrease in the size of the two lesions**. There is an approximate **forty-percent decrease in the linear dimensions of the hypothalamic lesion** and **fifty-percent reduction in the lesion within the pineal gland**.

"IMPRESSION:

1. Reevaluation of the study performed on 7-21-10 showing a **significant reduction in size** of the lesions known in the hypothalamus and pineal gland in comparison to the prior study of 9-25-09." [Emphasis added.]

23. So that's where things stand now. Seth is continuing his nutritional and herbal supplements, particularly GDU, and homeopathy. We were told that there were no alternatives to chemotherapy and radiation for Seth, and that without them the tumors would grow, and he would become blind, paralyzed, and die. These statements were based on ignorance — as medical oncologists and surgical oncologists know what they know based on what they were taught, and how they make their living, but have little curiosity to explore alternatives to the choices by which they earn their incomes. As I told the caseworker when she told me to get other opinions from oncologists that natural remedies could be effective: "I can't, they all goosestep to the same drummer." An oncologist who defies the prevailing attitude of cut, burn and poison (*i.e.*, surgery, radiation and chemotherapy) does so at the peril of losing his license. Ignorance can be forgiven, but if combined with arrogance — that only

oncologists know and can determine what is true — it can lead to misery and death, especially when the power of government and medical boards weigh into personal decisions to demand patient obedience to powerful medical and pharmaceutical interests. If we had followed the advice of the oncologists, there is no telling what condition Seth would be in today.

24. Relevant to the case before this court, if our family had not had access to the products sold by Daniel Chapter One, and their advice about how to use them, there is no telling how Seth would be today either. Fortunately, our need for their help from them came before the April 1, 2010 injunction against DCO sharing product advice. This Court needs to understand that there are others out there right now like Seth who could be helped by DCO, who cannot be helped with important product information because of the FTC's injunction. Rather than seek to condemn DCO for helping people deal with various illnesses, the Court should commend the wonderful work that DCO does to help families like mine.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31 day of August, 2010

TEDD KOREN, D.C.