**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
UNITED STATES OF AMERICA        )
DEPARTMENT OF JUSTICE,          )
                               )
            Plaintiff,          )
                               ) Civil Action No. 10-1362 (EGS)
        v.                      )
                               )
DANIEL CHAPTER ONE, et al.,     )
                               )
            Defendants.         )
_____)
```

<u>**MEMORANDUM OPINION**</u>

This case involved certain dietary supplements that defendants claimed could treat, cure, or prevent cancer, inhibit tumors, and ameliorate the adverse effects of radiation and chemotherapy.  Plaintiff United States of America Department of Justice ("United States" or the "government") brought this action against Daniel Chapter One and James Feijo (the "defendants") under Sections 5(l), 13(b), and 16(a) of the Federal Trade Commission Act, 15 U.S.C. §§ 45(l), 53(b), and 56(a), alleging that the defendants violated a final cease and desist order of the Federal Trade Commission ("FTC" or the "Commission").  On September 30, 2011, the United States filed a motion for summary judgment on liability.  On September 24, 2012, the Court granted the United States' motion, concluding that "there is no genuine issue as to any material fact and the

United States is entitled to judgment as a matter of law on liability." *See United States v. Daniel Chapter One*, 896 F. Supp. 2d 1, 17 (D.D.C. 2012).

Pending before the Court is the United States' motion for entry of final judgment.  The United States requests that the Court enter a final order that includes injunctive relief, equitable monetary relief in the amount of $1,345,832.43 and a civil penalty award of $3,528,000.  Upon consideration of the motion, the response and reply thereto, supplemental briefing by the parties, the applicable law, and the entire record in this case, the Court **GRANTS** the United States' motion.

## I.   Background

Defendant Daniel Chapter One is incorporated under the laws of the State of Washington, with its principal place of business in Portsmouth, Rhode Island.  *Id.* at 2.  Defendant James Feijo is the sole member and overseer of Daniel Chapter One.  *Id.*  The defendants advertise and sell dietary supplements, including BioShark, 7 Herb Formula, GDU, and BioMixx (the "Products"), which they claim can treat, cure, or prevent cancer.  *Id.*

On September 18, 2008, the FTC initiated an administrative proceeding alleging that the defendants' marketing of the Products constituted deceptive acts and practices in violation of Sections 5(a) and 12 of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. §§ 45(a) and 52.  *Id.* at 2-3.  Following a

trial, an administrative law judge concluded that the defendants had violated the FTC Act by making unsubstantiated claims that the Products prevented, treated, or cured tumors or cancer.  *Id.* Defendants appealed this decision to the Commission, and on December 24, 2009, the Commission upheld the decision and issued a Final Order to cease and desist certain practices.  *Id.*

On January 25, 2010, the FTC issued a Modified Final Order ("FTC Order").  *Id.* at 3.  Part II of the FTC Order prohibits the defendants (referred to in the FTC Order as "Respondents") from making "any representation, in any manner, expressly or by implication, including through the use of product or program names or endorsements"[1] that any product marketed by the defendants:

> [P]revents, treats, or cures or assists in the prevention, treatment, or cure of any type of tumor or cancer, including but not limited to representations that:
> 1. BioShark inhibits tumor growth;
> 2. BioShark is effective in the treatment of cancer;
> 3. 7 Herb Formula is effective in the treatment or cure of cancer;
> 4. 7 Herb Formula inhibits tumor formation;
> 5. GDU eliminates tumors;
> 6. GDU is effective in the treatment of cancer;
> 7. BioMixx is effective in the treatment of cancer; or
> 8. BioMixx heals the destructive effects of radiation or chemotherapy;

---

[1] The FTC Order states that the term "endorsement" shall be defined as in 16 C.F.R. § 255.0(b), which states that "an endorsement means any advertising message . . . that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsoring advertiser, even if the views expressed by that party are identical to those of the sponsoring advertiser."  16 C.F.R. § 255.0(b).

unless the representation is true, non-misleading, and, at
the time it is made, Respondents possess and rely upon
competent and reliable scientific evidence that
substantiates the representation.

*Id.* 3-4.  In addition, Part V.B of the FTC Order requires that:

Within forty-five (45) days after the final and effective
date of this order, Respondents shall send by first class
mail, postage prepaid, an exact copy of the notice . . . to
all persons [who purchased the Products between January 1,
2005 and the date of the order.]

*Id.* The notice, which is attached to the FTC Order, informs

consumers of the FTC's conclusion that the defendants'

advertising claims were deceptive because they were not

substantiated by competent and reliable scientific evidence. *Id.*

Defendants filed an appeal with the United States Court of

Appeals for the District of Columbia Circuit, contesting the

legality and constitutionality of the FTC Order.  *See* Petition

for Review, *Daniel Chapter One v. FTC*, No. 10-1064 (D.C. Cir.

Mar. 17, 2010).  Defendants also applied to the FTC for a stay

of the FTC Order pending the outcome of their appeal, but their

request was denied.  *Daniel Chapter One*, 896 F. Supp. 2d at 3-4.

Defendants then filed with the D.C. Circuit an emergency motion

for a stay of the FTC Order.  This motion was denied on April 1,

2010.  *See* Per Curiam Order Denying Emergency Motion to Stay

Case, *Daniel Chapter One*, No. 10-1064 (D.C. Cir. Apr. 1, 2010).

Because the defendants failed to obtain a stay, the FTC Order

became effective on April 2, 2010.  *See Daniel Chapter One*, 896 F. Supp. 2d at 3-4; 15 U.S.C. § 45(g)(2).

On August 13, 2010, the United States filed its complaint in this Court seeking civil penalties and other injunctive relief pursuant to Sections 5(l), 13(b), and 16(a) of the FTC Act.  Simultaneous therewith, the United States filed a motion for a preliminary injunction seeking an order enjoining the defendants from violating the FTC Order.  *Daniel Chapter One*, 896 F. Supp. 2d at 3-4.  The Court denied the United States' motion for a preliminary injunction without prejudice on September 14, 2010, finding that the Court lacked jurisdiction to enforce the FTC Order while defendants' appeal challenging the legality of the FTC Order was pending before the D.C. Circuit.  *See* Order, Sept. 14, 2010, ECF No. 11.[2]  The FTC then filed an emergency motion for an order of enforcement *pendente lite* with the D.C. Circuit.  The D.C. Circuit granted the United States' motion on November 22, 2010.  *See* Per Curiam Order, *Daniel Chapter One*, No. 10-1064 (D.C. Cir. Nov. 22, 2010) ("Daniel Chapter One is hereby enjoined to obey forthwith the modified final order of the Federal Trade Commission issued January 25, 2010, in Docket No. 9329, *In the Matter of Daniel*

---

[2] The Court also denied the defendants' motion to dismiss, concluding that the United States' penalty suit was properly before the Court.  *See* 15 U.S.C. § 45(l); *see also United States v. Standard Educ. Soc'y*, 55 F. Supp. 189, 193 (N.D. Ill. 1943).

*Chapter One and James Feijo*.").  Defendants then filed a motion
with the D.C. Circuit seeking a stay of the enforcement of Part
V.B of the FTC Order.  The D.C. Circuit rejected this request on
December 7, 2010.  *See* Per Curiam Order, *Daniel Chapter One*, No.
10-1064 (D.C. Cir. Dec. 7, 2010).

On December 10, 2010, the D.C. Circuit denied the
defendants' petition for review of the FTC Order, concluding
that "the Commission properly exercised jurisdiction over
[Daniel Chapter One]," and that "[Daniel Chapter One]'s
arguments based upon the Constitution and the Religious Freedom
Restoration Act are *wholly without merit*."  *Daniel Chapter One
v. FTC*, 405 F. App'x 505, 505-06 (D.C. Cir. 2010) (emphasis
added).  Defendants then filed a petition for a writ of
certiorari, which was denied on May 23, 2011.  *See Daniel
Chapter One v. FTC*, No. 10-1292, 131 S. Ct. 2917 (2011).

Following issuance of the D.C. Circuit's mandate, the
United States renewed its motion for a preliminary injunction in
this Court.  On June 22, 2011, the Court granted the United
States' motion for preliminary injunction and enjoined the
defendants from violating the FTC Order.  *See* Order and
Memorandum Opinion, ECF Nos. 31 and 32.

On July 29, 2011, the United States filed a motion for an
order to show cause why Daniel Chapter One, James Feijo, and

Patricia Feijo[3] should not be held in contempt of the Court's
June 22, 2011 Order.  The Court subsequently ordered the
defendants to show cause why they should not be held in
contempt.  The Court held a contempt hearing on May 9, 2012.
During that hearing, the United States presented evidence and
testimony regarding the defendants' purported violations of the
FTC Order.  After receiving evidence and hearing argument, the
Court found Daniel Chapter One, James Feijo, and Patricia Feijo
in civil contempt.  Specifically, the Court concluded that James
Feijo, Patricia Feijo, and Daniel Chapter One (the "Contemnors")
had continued to violate the FTC Order by (1) continuing to make
representations on their radio show that their products treat or
cure cancer without competent and reliable scientific evidence

_____

[3]  Although Patricia Feijo is not a defendant in this action, the
United States argued that she was bound by the preliminary
injunction pursuant to Federal Rule of Civil Procedure 65(d)(2),
which provides that a preliminary injunction binds:

>    (A)   the parties;
>    (B)   the parties' officers, agents, servants, employees,
>          and attorneys; and
>    (C)   other persons who are in active concert or
>          participation with anyone described in Rule
>          65(d)(2)(A) or (B) as long as those individuals
>          "receive actual notice of it by personal service or
>          otherwise[.]"

Fed. R. Civ. P. 65(d)(2).  The United States argued that
Patricia Feijo received actual notice of the Order and that she
was "in active concert or participation" with James Feijo and
Daniel Chapter One.  *Daniel Chapter One,* 896 F. Supp. 2d at 5-6.
Defendants did not dispute that Patricia Feijo is an agent,
representative, or employee of Daniel Chapter One.  *Id.*

to substantiate those representations, (2) encouraging potential customers to visit websites containing Daniel Chapter One publications that contain prohibited information and endorsements of the prohibited supplements, (3) not removing certain representations from the websites within their control, which Contemnors conceded included www.danielchapterone.com, www.dc1ministry.com, and www.dc1freedom.com, and (4) failing to mail the required notice to all consumers who purchased the Products between January 1, 2005, and April 2, 2010. *Daniel Chapter One*, 896 F. Supp. 2d at 5-6.  The Court allowed the Contemnors two weeks to attempt to purge the contempt and scheduled another hearing in order to determine whether or not the contempt had been purged.  *Id.*

On May 22, 2012, James Feijo submitted a certification of compliance with the Court's Order.  In that certification, Mr. Feijo stated that all notices had been sent out in compliance with the Court's Order; that prohibited representations had been removed from www.dc1freedom.com, www.danielchapterone.com, the dc1 online store, and www.dc1ministry.com; that Contemnors had ceased answering health questions on their radio show or inviting other callers to answer questions; and that Contemnors were not mentioning other people's websites containing Daniel Chapter One information.  *See* James Feijo's Certification of Compliance, ECF No. 51.  At a subsequent hearing on May 23,

8

2012, the United States presented additional evidence that Contemnors had not purged the contempt, but the Court gave Contemnors until May 24, 2012 at 3:30 p.m. to make a showing to the Court sufficient to demonstrate their compliance with the Court's Order. *Daniel Chapter One*, 896 F. Supp. 2d at 6-7. On May 24, 2012, the defendants filed a supplemental certification of compliance with the Court's Order, and the United States filed a notice of failure to purge. *See* Defs.' Supplemental Certification of Compliance with Order, ECF No. 52; Pl.'s Notice of Failure to Purge, ECF No. 53. The Court determined that Contemnors had taken sufficient actions to purge themselves of contempt, and therefore the Court vacated its Contempt Order. *See* Minute Order, May 24, 2012.

On September 30, 2011, the United States filed a motion for summary judgment on liability. On September 24, 2012, the Court granted the United States' motion, concluding that "there is no genuine issue as to any material fact and the United States is entitled to judgment as a matter of law on liability as to Counts I (Prohibited Representations) and II (Failure to Mail Notice)." *Daniel Chapter One*, 896 F. Supp. 2d at 17. On November 27, 2012, the Court granted the United States' request for limited discovery concerning the defendants' ability to pay a civil penalty under the FTC Act. *See* Minute Order, Nov. 27, 2012. Discovery closed on June 4, 2013.

On April 14, 2014, the United States filed the pending motion for entry of final judgment.  *See* Pl.'s Mot., ECF No. 68. The United States requests that the Court enter a final order that includes injunctive relief, equitable monetary relief in the amount of $1,345,832.43 and a civil penalty award of $3,528,000.  On May 19, 2014, the defendants filed their opposition.[4]  *See* Defs.' Opp., ECF No. 70.  On June 6, 2014, the United States filed its reply.  *See* Pl.'s Reply, ECF No. 72. The United States' motion is now ripe for determination by the Court.

## II.  **The FTC Act**

The FTC Act authorizes district courts to award civil penalties and to grant injunctions and other equitable relief where an FTC order or consent decree has been violated.  *See* 15 U.S.C. § 45 ("United States district courts are empowered to grant mandatory injunctions and such other and further equitable

---

[4] On January 22, 2013, the defendants filed a motion to stay the proceedings pending completion of a federal criminal investigation, and disposition of any resulting indictments and prosecutions, of James Feijo and Daniel Chapter One in the State of Rhode Island.  *See* Defs.' Mot. to Stay, ECF No. 22.  The Court denied the defendants' motion to stay.  *See* May 5, 2013 Minute Order.  On May 20, 2014, the defendants file a renewed motion to stay the proceedings pending the resolution of the criminal proceedings in *United States v. James Feijo, Patricia Feijo and Daniel Chapter One* in Case No. 1:14-cr-00048-M-LDA. The Court denied the defendants' renewed motion to stay.  *See* October 6, 2014 Minute Order.  The Court also directed the defendants to supplement their opposition to the United States' motion for entry of final judgment.  *Id.*

relief as they deem appropriate in the enforcement of such final orders of the Commission."); *Id.* (The district court is authorized to impose civil penalties upon "[a]ny person, partnership or corporation who violates an order of the Commission").

Although the FTC Act "does not expressly authorize a district court to grant consumer redress (i.e., refund, restitution, rescission, or other equitable monetary relief), Section 13(b)'s grant of authority to provide injunctive relief carries with it the full range of equitable remedies," see *FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005), including disgorgement of profits. *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *see also CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1344 (11th Cir. 2008) (the FTC Act's "grant of authority to issue an injunction carried the full range of equitable remedies, among which 'is the power to grant restitution and disgorgement'" (internal citations omitted)). "An order for disgorgement may be considered an equitable adjunct to an injunction decree." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946)); *see also Freecom Communications*, 401 F.3d at 1203 n.6 ("In cases where the FTC seeks injunctive relief, courts deem any monetary relief sought as incidental to injunctive relief.").

11

In other words, a district court's authority to award monetary relief under Section 13(b) falls within its general equitable jurisdiction to "decide all relevant matters in dispute and to award complete relief." *Porter*, 328 U.S. at 399; *see also FTC v. Cantkier*, 767 F. Supp. 2d 147, 160 (D.D.C. 2011) ("Every court that has considered the issue thus far appears to have ruled that Section 13(b) *does* entitle the FTC to seek equitable monetary relief, including courts in this district and multiple Courts of Appeals." (emphasis in original)); *FTC v. Mylan Labs*, *Inc.,* 62 F. Supp. 2d 25, 37 (D.D.C. 1999); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 571-72 (7th Cir. 1989).

## III. Analysis

The United States requests that the Court enter a final order that includes injunctive relief, equitable monetary relief in the amount of $1,345,832.43 and a civil penalty award of $3,528,000. *See* Pl.'s Mot., ECF No. 68. The Court will address each requested form of relief sought in turn.

### A. A Permanent Injunction Is Necessary to Protect The Public.

On June 22, 2011, the Court granted the United States' motion for a preliminary injunction. The Court ordered the

following:  "defendants are hereby enjoined to obey forthwith
the Modified Final Order of the Federal Trade Commission issued
on January 25, 2010, in Docket No. 9329, *In the Matter of Daniel
Chapter One and James Feijo*."  *See United States v. Daniel
Chapter One*, 793 F. Supp. 2d 157, 164 (D.D.C. 2011).  In its
motion, the United States asserted that the permanent injunction
should encompass the preliminary injunction – which required the
defendants to comply with the FTC Order – with "additional
restrictions and requirements."  *See* Pl.'s Mot., ECF No. 68 at
5.  Specifically, the United States argued that "there is an
overwhelming need to:  (1) broaden coverage of the FTC Order
provisions to ban the defendants from selling any dietary
supplement and from marketing any product or service with
disease claims; and (2) enhance the compliance monitoring
provisions to help the FTC guard against order violations in the
future."  *Id.*  In support of its motion, the government states
that the defendants' "pervasive and flagrant order violations
evidence that the FTC Order did not achieve its purpose of
protecting the public and demonstrate that they likely will
repeat their fraudulent activities and victimize consumers
unless their practices are more significantly curtailed."  *Id.*

This Court is "empowered to grant mandatory injunctions and
such other and further equitable relief as [it] deem[s]
appropriate in the enforcement of such final orders of the

Commission."  15 U.S.C. § 45(l).  "A federal court has broad

power to restrain acts which are of the same type or class as

unlawful acts which the court has found to have been committed

or whose commission in the future, unless enjoined, may fairly

be anticipated from the defendant's conduct in the past."

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100,

132 (1969); *NLRB v. Express Publ'g Co.,* 312 U.S. 426, 435

(1941).  The breadth of the injunction must depend upon the

circumstances of the particular case, "the purpose being to

prevent violations, the threat of which in the future is

indicated because of their similarity or relation to those

unlawful acts . . . found to have been committed . . . in the

past."  *Express Publ'g*, 312 U.S. at 436-37.  Courts in equitable

actions may enjoin otherwise lawful conduct to ensure that the

final relief ordered is effective.  *See United States v. Loew's,*

*Inc.*, 371 U.S. 38, 53 (1962) ("Some of the practices which the

government seeks to have enjoined with its requested

modifications are acts which may be entirely proper when viewed

alone. To ensure, however, that relief is effectual, otherwise

permissible practices connected with the acts found to be

illegal must sometimes be enjoined."); *EEOC v. Wilson Metal*

*Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994) ("The proper scope

of an injunction is to enjoin conduct which has been found to

have been pursued or is related to the proven unlawful

conduct."); *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985) ("A federal court's equity jurisdiction affords it the power to enjoin otherwise lawful activity when necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct."); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 390 (5th Cir. 1977) ("In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable.").

A "court's power to grant injunctive relief survives discontinuance of the illegal conduct," and because the "purpose . . . is to prevent future violations," injunctive relief is appropriate when there is a "cognizable danger of recurrent violation, something more than the mere possibility." *United States, v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). Once a violation is demonstrated, all that need be shown is that "there is some reasonable likelihood of future violations," and past unlawful conduct is "highly suggestive of the likelihood of future violations." *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

In addition, courts can order broad "fencing in" injunctive relief in actions brought under the FTC Act. *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1016 (N.D. Ind. 2000).

15

Indeed, the Supreme Court has held that, when entering orders, the FTC "cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be bypassed with impunity."  *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952); *see also FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some fencing in."); *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 429 (1957).

Further, courts may order record-keeping and monitoring to ensure compliance with a permanent injunction.  *See, e.g., FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999) (holding that record-keeping and monitoring provisions were appropriate to permit the Commission to police the defendants' compliance with the order); *FTC v. U.S. Sales Corp.*, 785 F. Supp. 737, 753-54 (N.D. Ill. 1992) (indicating that monitoring by the Commission may be necessary to ensure adequate compliance); *FTC v. Sharp*, 782 F. Supp. 1445, 1456-57 (D. Nev. 1991) (judgment included monitoring provisions).

In deciding whether to issue an injunction in light of past violations, courts consider "the totality of the circumstances surrounding the defendant[s] and [their] violations[,]"

including: (1) the degree of scienter involved; (2) whether the infraction was isolated or recurrent; (3) whether the defendants recognize "the wrongful nature of [their] conduct;" (4) "the sincerity of [the defendants] assurance against future violations[;]" (5) the degree of consumer harm caused by the defendants; and (6) "whether defendants are positioned to commit future violations[.]"  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 323 (S.D.N.Y. 2008).

The record in this case is crystal clear:  From April 2, 2010, when the FTC Order went into effect, until May 24, 2012, when the defendants came into compliance with the FTC Order, the defendants intentionally and knowingly violated the FTC Order. From November 22, 2010, when the D.C. Circuit issued an Order enjoining the defendants to "obey forthwith the modified final order," until May 24, 2012, the defendants intentionally and knowingly violated the D.C. Circuit's Order.  *See* Per Curiam Order, *Daniel Chapter One*, No. 10-1064 (D.C. Cir. Nov. 22, 2010).  From June 22, 2011, when this Court issued a preliminary injunction, until May 24, 2012, the defendants intentionally and knowingly violated this Court's preliminary injunction.  *See* Order and Memorandum Opinion, ECF Nos. 31 and 32.  The defendants were well aware of what they were required to do to comply with the various orders, yet ***deliberately*** chose to

17

continuously ignore and violate all orders.  The record is replete with evidence that the defendants – during the relevant dates noted above – among other things, continued to make representations on their radio show that their products treat or cure cancer without competent and reliable scientific evidence to substantiate those representations and encouraged potential customers to visit websites containing Daniel Chapter One publications that contain prohibited information and endorsements of the prohibited supplements. *See Daniel Chapter One*, 896 F. Supp. 2d at 17.

Rather than grapple with the mountain of precedent cited by the United States or the factual record in this case, the defendants, ***in a very cursory response*** – which cites no authority – asserted that the United States has not proffered any evidence that the defendants "have engaged in improper activities since the Court found they were in compliance with the FTC Order on May 24, 2012." *See* Defs.' Opp., ECF No. 70 at 2.  It is well established, however, that current compliance does not preclude the entry of a permanent injunction, and a permanent injunction is justified if "there exists some cognizable danger of recurrent violation" or "some reasonable likelihood of future violations." *W.T. Grant Co.*, 345 U.S. at 633; *Hunt*, 591 F.2d at 1220 (internal citations omitted); *see also Am. Bar Ass'n v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011)

("[A] defendant's voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and determine the case.").

Considering the fact that preliminary injunctive relief has already been ordered against the defendants in this case, the Court now determines, based on the factual record, that a permanent injunction is necessary and appropriate to protect consumers. The Court concludes that – in order to protect the public – the permanent injunction should encompass the preliminary injunction with the modifications suggested by the United States. Specifically, the permanent injunction will ban the defendants from selling any dietary supplement and from making disease claims. Additionally, the permanent injunction will enhance the United States' monitoring authority. *See e.g.*, *FTC v. Gill*, 265 F.3d 944, 957-58 (9th Cir. 2001) (affirming the district court's order prohibiting defendant from engaging in the credit repair business).

Defendants' pattern of deceiving consumers in complete disregard of orders from the FTC, this Court and the D.C. Circuit raises serious concerns that the defendants would inflict further injury on consumers in the future without these modifications. Further, the defendants have made widely-disseminated efficacy claims for a multitude of products without possessing reliable scientific evidence to substantiate those

representations.  Undoubtedly, the defendants' dietary supplement marketing involves deliberate, deceptive strategies that are easily adaptable or transferable to other products, and the evidence in this case shows that – in addition to their claims that the Products cure cancer – the defendants also make health-related representations about their other products.  *See e.g.,* http://dc1store.com/products/apple-pectin-50-off ("This gentle and nourishing fiber also helps support healthy cholesterol levels and a healthy heart and gallbladder." (last visited March 12, 2015));

http://dc1store.com/products/carniplex-60-cap-2-or-more ("Carniplex can help support healthy liver, heart, and blood triglyceride levels. It may assist in fat loss and muscle health, and enhance the effectiveness of antioxidants C and E." (last visited March 12, 2015)).

In order to ensure enforcement of this Memorandum Opinion, and the accompanying Order, the Court adopts the enhanced compliance monitoring provisions recommended by the United States, which would require the defendants to:  dispose of customer information, acknowledge receipt of the Final Order in this case and distribute it to certain company representatives, provide a written report on their business activities and periodic updates such as change of address notifications, maintain specified records in future businesses and produce

information to the Commission upon request about their compliance.  Stringent compliance monitoring provisions are appropriate to ensure the defendants' compliance in the future. *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1084 (E.D. Mo. 2007) (adopting enhanced compliance monitoring provisions in response to FTC defendant's order violations); *see also Think Achievement Corp.*, 144 F. Supp. 2d at 1018; *FTC v. U.S. Sales Corp.*, 785 F. Supp. 737, 753 (N.D. Ill. 1992); *FTC v. Sharp*, 782 F. Supp. 1445, 1456-57 (D. Nev. 1991).  The requested provisions will provide an oversight mechanism to better ensure that the defendants do not engage in future recidivism.

### B. Equitable Monetary Relief Is Appropriate In This Case.

The defendants challenge this Court's authority to award a money judgment under Section 13(b) of the FTC Act.  Because the Court concludes that Section 13(b) permits a district court to order ancillary equitable relief, including monetary relief, and that such relief may be calculated on the basis of proceeds that the defendants received from their unlawful activity, the Court will award equitable monetary relief in the amount of $1,345,832.43.

### 1. Ancillary Remedies Under Section 13(b) of the FTC Act

Section 13(b) of the FTC Act provides: "in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).  While the

provision's express text refers only to injunctive relief,
courts have consistently held that "the unqualified grant of
statutory authority to issue an injunction under [S]ection 13(b)
carries with it the full range of equitable remedies, including
the power to grant consumer redress and compel disgorgement of
profits."  *Gem Merch. Corp.*, 87 F.3d at 468; *see also Bronson*,
654 F.3d at 365; *Pantron I Corp.*, 33 F.3d at 1102; *FTC v. Sec.
Rare Coin & Bullion Corp.*, 931 F.2d at 1316; *Freecom
Communications*, 401 F.3d at 1202 n.6; *Amy Travel Serv., Inc.*,
875 F.2d at 571-72; *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711,
718-19 (5th Cir. 1982); *Cantkier*, 767 F. Supp. 2d at 160; *FTC v.
Swish Mktg*, 2010 WL 653486, at *6-10 (N.D. Cal. Feb. 22, 2010);
*FTC v. Davison Assocs.*, 431 F. Supp. 2d 548, 560 (W.D. Pa.
2006); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 533
(S.D.N.Y. 2000); *FTC v. Mylan Labs, Inc.* 62 F. Supp. 2d at 37;
*FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 261-62 (E.D.N.Y.
1998).  This Court joins with these courts and holds that
Section 13(b) of the FTC Act permits district courts to grant
ancillary equitable relief, including equitable monetary relief.

In *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946), the
Supreme Court held that the Emergency Price Control Act of 1942
– which permitted a federal administrator to seek a "permanent
or temporary injunction, restraining order, or other order" –
authorized the administrator to obtain not just injunctive

relief but also a money judgment.  The Supreme Court provided
two independent reasons for its conclusion.  First, the Supreme
Court explained:

> [An order for disgorgement] may be considered an
> equitable adjunct to an injunction decree. Nothing is
> more clearly a part of the subject matter of a suit for
> an injunction than the recovery of that which has been
> illegally acquired and which has given rise to the
> necessity for injunctive relief. . . . [W]here, as here,
> the equitable jurisdiction of the court has properly
> been invoked for injunctive purposes, the court has the
> power to decide all relevant matters in dispute and to
> award complete relief even though the decree includes
> that which might be conferred by a court of law.

*Id.* at 399.[5]  Second, relying on the text of the Emergency
Price Control Act, the Supreme Court reasoned that a money
judgment could be an "other order" that is "appropriate and
necessary to enforce compliance with the act."  *Id.* at 400.

The Supreme Court subsequently made clear that the two
bases for its holding in *Porter* were indeed independent.  In
*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960),
the Supreme Court concluded that a provision of the Fair Labor
Standards Act that authorized the district court to "restrain
violations of [the statute]" carried with it the power to award

---

[5] Monetary damages were not traditionally available in equity
because "[m]oney damages are, of course, the classic form of
legal relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255
(1993). The power of equitable courts to afford "complete
relief," *Porter*, 328 U.S. at 399, meant, however, that equitable
courts could afford monetary relief when necessary to provide a
complete equitable remedy.

backpay to employees who had been wrongfully discharged.  After

citing *Porter's* holding that a district court empowered to

enjoin statutory violations may award such ancillary remedies as

necessary to afford complete relief, the Supreme Court went on

to note:

> The applicability of this principle is not to be denied,
> either because the Court there considered a wartime
> statute, or because, having set forth the governing
> inquiry, it went on to find in the language of the
> statute affirmative confirmation of the power to order
> reimbursement.

  *Id.* at 291.

  Like the provision at issue in *Mitchell*, Section 13(b)

contains no reference to "other orders."  Nonetheless, the

principle that "the comprehensiveness of [the district court's]

equitable jurisdiction is not to be denied or limited in the

absence of a clear and valid legislative command," *Mitchell*, 361

U.S. at 291 (quoting *Porter*, 328 U.S. at 398), applies with

equal force to actions under Section 13(b).  By empowering

district courts to issue injunctive relief, Section 13(b)

invokes the equitable jurisdiction of the Court.  A money

judgment is thus permitted as a form of ancillary relief because

– once its equitable jurisdiction has been invoked – "the court

has the power to decide all relevant matters in dispute and to award complete relief." *Porter*, 328 U.S. at 399.

Accordingly, Section 13(b) of the FTC Act permits this Court to award not only injunctive relief but also ancillary relief, including monetary relief. *Bronson*, 654 F.3d at 365.

## 2. Monetary Relief Under Section 13(b)

Equitable monetary relief is calculated using a "two-step burden-shifting framework . . . [that] requires a court to look first to the FTC to 'show that its calculations reasonably approximated the amount of the defendant[s'] unjust gains' and then shift the burden 'to the defendants to show that those figures were inaccurate.'" *Id.* at 364 (quoting *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 67 (2d Cir. 2006)).

At the first step of the burden-shifting analysis, the United States calculated the defendants' unjust gains as $1,345,832.43.  This amount, the United States asserted, equals the amount consumers spent on the Products between April 2, 2010, when the FTC Order went into effect, and May 24, 2012, when the defendants purged itself of contempt.  *See* Pl.'s Mot., ECF No. 68 at 9-10 (citing sales records provided by the defendants).

At the second step of the burden-shifting analysis, the defendants do not proffer any evidence to show that the United States' calculations were inaccurate.  *See* Defs.' Opp., ECF No.

70 at 2-3.   Therefore, the defendants concede that the United States' calculation of their unjust gains is accurate.  *McGinnis v. District of Columbia*, 2014 WL 4243542, at *15 (D.D.C. Aug. 28, 2014) (when a party "fails to address [an argument] in its [opposition] . . . the Court will deem it abandoned").

Accordingly, the Court will award equitable monetary relief in the amount of $1,345,832.43.

### C. Civil Penalty

Under the FTC Act, the Court is authorized to impose civil penalties upon "[a]ny person, partnership or corporation who violates an order of the Commission[.]"  15 U.S.C. § 45(l).  The statute originally provided for "a civil penalty of not more than $10,000 for each violation;" that sum, however, was modified pursuant to the Federal Civil Penalties Inflation Adjustment Act, and is now $16,000 per violation.  15 U.S.C. § 45(l); 28 U.S.C. § 2461; 16 C.F.R. § 1.98(d).  The FCT Act further provides that "[e]ach separate violation of such an order shall be a separate offense[.]"  15 U.S.C. § 45(l).  Here, the defendants intentionally and knowingly violated the FTC Order from April 2, 2010, when the FTC's Order went into effect, to May 24, 2012, when the defendants came into compliance.

During each of these **784 days**, the defendants committed multiple violations of the FTC Order.  *See generally Daniel Chapter One*, 896 F. Supp. 2d at 1-17.  For example, the

defendants promoted the Products as cancer treatments in multiple locations, including placing misrepresentations on several websites under their control and on online forums.  *Id.* Further, the defendants represented to customers that the Products treat and cure cancer on their radio show, and would then post the shows online so that others could access the information.  *Id.*  In addition, the defendants neglected to send the required corrective notices to their prior customers.  *Id.* Each individual misrepresentation is a separate violation, and every corrective notice they failed to send is a separate violation. *See, e.g.*, *United States v. Nat'l Fin. Servs. Inc.*, 98 F.3d 131, 141 (4th Cir. 1996) (finding that each letter sent was a separate violation).  This adds up to thousands of violations and an enormous civil penalty sum.

Where the violation is a "continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense."  15 U.S.C. § 45.  Under this provision, each day that the defendants failed to comply with the FTC Order should be deemed a separate violation.  While the defendants would certainly be liable for a much higher penalty amount if the Court were to count each individual violation, the Court is of the opinion that the "continuing failure" calculation is the appropriate calculation in this case.  At the statutory maximum

of $16,000 per violation, the defendants would be liable for a civil penalty up to the amount of $12,544,000 for the 784 days they failed to comply with the FTC Order.

While the defendants are subject to a $12,544,000 statutory maximum civil penalty, which the defendants do not dispute, see generally Defs.' Opp., ECF No. 60, the Court determines the appropriate civil penalty to be imposed by considering five separate factors.  *See United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988, 993 (11th Cir. 1984); *United States v. Reader's Digest Ass'n*, 662 F.2d 955, 967 (3d Cir. 1981). Specifically, courts consider: "(1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendants' ability to pay; (4) the desire to eliminate the benefits derived by the violations; and (5) the necessity of vindicating the authority of the FTC."  *Danube Carpet Mills, Inc.*, 737 F.2d at 994.  The United States asserted that, based upon an analysis of these factors, a civil penalty award in the amount of $3,528,000 – a sum which equals a $4,500 penalty every day in which the defendants failed to comply with the FTC Order – is appropriate. *See* Pl.'s Mot., ECF No. 68 at 11-12. The Court agrees.

### 1. The Defendants Acted in Bad Faith.

There is no doubt that the defendants acted with "actual knowledge" that their conduct was unlawful and violated orders from the FTC, this Court and the D.C. Circuit.  *See* 15 U.S.C. §

45. In other words, the defendants knew – at the time they
*intentionally violated each order* – that their conduct was
unlawful and yet continued to engage in that conduct. This is
bad faith.

The FTC Order became effective on April 2, 2010. Rather
than comply with the FTC Order, the defendants knowingly and
deliberately continued to represent on websites, online forums,
and their radio show that the Products would treat or cure
cancer. Defendants' own statements demonstrate that their
conduct was willful and deliberate. For example, as previously
found by this Court,

> [D]uring a radio show broadcast on June 23, 2011, the
> Feijos took a call from an individual who identified
> himself as Curtis, and who said that his daughter had
> cancer. James Feijo advised Curtis to go online and
> read the testimonies the Daniel Chapter One website to
> learn more, and stated that they support "God's way"
> of treating cancer through the use of 7 Herb Formula,
> BioShark, and GDU. In addition, James Feijo told
> Curtis that "the government is trying to stop us from
> helping you and your daughter . . . they want to not
> let us tell you about 7 Herb Formula, BioShark, and
> GDU, that God has given us to help people around the
> world." Patricia Feijo added:

> ["W]e do care about your daughter . . . **we just heard
> from our lawyer that a judge ruled in favor of the
> Trade Commission, and so, you know, basically we can
> be fined out of existence tonight or, or, put into
> prison**, and we want people to know the reality that
> we're sitting here, willing to risk even our lives, to
> serve the lord and to serve you, right, but the
> situation is such that I would say get the product
> while you can, even stock up while you can, and if one
> day you won't be able to get our products then just,
> you know, try to continue to follow pretty much what

those products are, the herbs, the enzymes, because
that's what we have seen work for many years.["]

James Feijo then gave Curtis information on how to
order the products, and directed Curtis to the
healthfellowship.org website for more information. At
other times during this same show, James Feijo stated
that Daniel Chapter One's products, including GDU,
were created and intended by God "for you, for your
health and healing, as a prevention, to mitigate, to
treat, to heal, to cure." Patricia Feijo told
listeners that they did not share their experiences
with the products had used it for a while and saw that
it did indeed work, and then we began to share with
people, hey, this is what works for this and that."
Patricia Feijo stated that the testimonies the Feijos
had received from their customers and placed on their
website and in their BioGuide were a sampling of their
customers' experiences and that the results in the
testimonials were "very typical of what people
experience." James and Patricia Feijo went on to
describe how 7-Herb Formula had cured a man who had
renal cancer.

*Daniel Chapter One*, 896 F. Supp. 2d at 11-12.

Additionally, the defendants knowingly and deliberately
ignored provisions in the FTC Order that required them to send a
corrective notice to past purchasers.  *Id.*  Moreover, the
defendants utterly failed to comply with the orders from the
D.C. Circuit (for over one year) and this Court (for about a
year) directing them to "obey forthwith" the FTC Order.  The
defendants did not send the corrective notice until,
conveniently, five days before the contempt hearing in this
case.  *See* Pl.'s Mot., ECF No. 68 at 13.

Further, the defendants' own statements make it clear that
they knew what they were required to do, and that they were

deliberately not complying with the FTC Order.  For example,

after the D.C. Circuit issued its decision denying the

defendants' petition for review of the FTC Order, the defendants

posted the following message on their website:

> Daniel Chapter One is being tortured right now for its
> opinion – its knowledge – about healing that is different
> from conventional medicine. Overseeer Jim Feijo has been
> threatened with bankrupting fines and incarceration for
> refusing to sign a government agency letter saying, in
> essense, the earth is flat. Literally, the letter
> denounces what Mr. Feijo knows to be true -- that Daniel
> Chapter One natural products are safe and effective in
> helping fight cancer and there is science supporting
> efficacy of their various ingredients -- and states what
> Mr Feijo and countless others know to be FALSE: that
> conventional cancer treatment has been proven safe and
> effective.

Pl.'s Mot., ECF No. 68 at Ex. D (typographic errors in

original).

In addition, the introduction to the Daniel Chapter One

Freedom website stated that:

> They ordered that we sign a letter they wrote, a
> deceptive letter saying that only conventional cancer
> treatment has been **proven safe and effective in humans,**
> and send it to thousands of people.
>
> **But Daniel Chapter One cannot bear false witness...**

*Id.* (emphasis in original).

Certainly, the defendants engaged in multiple violations over

many years and their actions were intentional, willful and

deliberate.  Indeed, the defendants failed to demonstrate any

intent to comply with the orders from the FTC, the D.C. Circuit or

this Court; the defendants only agreed to comply with the FTC Order because they were facing significant civil contempt sanctions.

Accordingly, the defendants' bad-faith violations of the orders from the FTC, this Court and the D.C. Circuit warrant the maximum civil penalty.[6]

### 2. Defendants Have Injured the Public.

The public harm in this case is significant and it occurred in several ways.  First, consumers who purchased the Products suffered financial harm.  Second, the defendants caused harm by publicizing deceptive information about their products and by failing to send the corrective notice to prior purchasers.  Third, the defendants injured the public when they instructed

---

[6] The defendants' argument that they engaged in "good faith" is nothing short of ridiculous.  *See* Defs.' Opp., ECF No. 70 at 4. On December 10, 2010, the D.C. Circuit denied the defendants' petition for review of the FTC Order, concluding that "the Commission properly exercised jurisdiction over [Daniel Chapter One]," and that "[Daniel Chapter One]'s arguments based upon the Constitution and the Religious Freedom Restoration Act are *wholly without merit*."  *Daniel Chapter One*, 405 F. App'x at 505-06.  The defendants reason that, because of their "heartfelt religious beliefs," they could continue to advance their position, which the D.C. Circuit held was "wholly without merit," in violation of the orders from the FTC, this Court and the D.C. Circuit.  The standard, however, is not whether the defendants had a "heartfelt belief," but whether the defendants acted with "actual knowledge" that their conduct was unlawful; as previously discussed, the facts in this case make clear that the defendants had actual knowledge that their conduct was unlawful yet continued to engage in that conduct.  15 U.S.C. § 45; *see also POM Wonderful, LLC v. FTC*, 777 F.3d 478, 498 (D.C. Cir. 2015).

consumers to stop using conventional, proven treatments and instead use the defendants' products.

Injury to the public can be found when consumers have lost money due to the defendants' violative conduct. *See, e.g., United States v. Prochnow*, No. 07-10273, 2007 WL 3082139, at *4 (11th Cir. Oct. 22, 2007) ("[C]ustomers [of a magazine telemarketer] were harmed by both the payments made for the magazine packages and the frustration, inconvenience, and expense involved in cancelling their subscription."). The financial harm is easily calculated in this case. As previously discussed, the defendants collected $1,345,832.43 from the sale of the Products between April 2, 2010, when the FTC's Order went into effect, and May 24, 2012, when the defendants stopped violating the FTC Order.

In addition to the financial harm, injury to the public occurred whenever the defendants' deceptive and violative materials reached the public. *See Danube Carpet Mills*, 737 F.2d at 994; *Reader's Digest*, 662 F.2d at 969. Contrary to the defendants' assertion, the United States does not need to introduce "evidence of consumer confusion or deception" because "(t)he principal purpose of a cease and desist order is to prevent material having a capacity to confuse or deceive from reaching the public . . . (t)hus, whenever such promotional items reach the public, that in and of itself causes harm and

injury." *Reader's Digest*, 662 F.2d at 969 (internal citations omitted).  Undoubtedly, the defendants caused substantial public harm by using deceptive promotional information on websites, online forums, and their radio show.  This injury to the public was further exacerbated because the defendants refused to mail the required notice informing consumers that the defendants' advertising claims were found by the FTC to be deceptive; such claims were not substantiated by competent and reliable scientific evidence.

Finally, after the D.C. Circuit ordered the defendants to "obey forthwith" the FTC Order, see Per Curiam Order, *Daniel Chapter One*, No. 10-1064 (D.C. Cir. Nov. 22, 2010), the defendants continued to advise people with cancer to stop conventional medical treatment and take the defendants' products instead.  For example, as previously found by this Court,

> During a radio show broadcast on February 22, 2011, Defendants accepted a call from a caller named Patricia, who stated that her doctor had found a mass on her breast. . . . James and Patricia Feijo instructed the caller not to get a biopsy, and Patricia Feijo stated that "if it is cancer, it can stir up the cells and can get them to spread[.]" . . . Patricia Feijo told the caller that she should take products "to treat it worst case scenario." . . . Defendants then asked someone to call in to help answer the caller's questions, and accepted a call from a caller named Greg, who said that, for "cancer . . . one thing I would add is BioShark to

34

> that." . . . Patricia Feijo confirmed this suggestion,
> stating, "yeah, definitely."

*Daniel Chapter One*, 896 F. Supp. 2d at 11-12.  This demonstrates

the third way the public was harmed by the defendants' conduct;

consumers suffered harm when they followed the defendants'

advice, stopping conventional proven treatments to use the

defendants' products.  Accordingly, the Court finds that this

factor weights strongly in favor of a substantial civil penalty.

### 3. A Civil Penalty Is Necessary to Eliminate Benefits Derived by the Defendants.

The third factor courts consider when entering a civil

penalty is the need to eliminate any benefits a defendant

received from the violation, and this factor is completely

separate from any consumer redress or disgorgement ordered by

the Court.  "Elimination of the benefits of noncompliance is an

essential element of the penalty, so that there is no incentive

to violate the law[.]"  *United States v. Mac's Muffler Shop,

Inc.*, 1986 WL 15443, *10 (N.D. Ga. Nov. 5, 1986); *see also

Reader's Digest*, 662 F.2d at 969.  Indeed, because a civil

penalty should "be more than . . . an acceptable cost of doing

business," the civil penalty should be higher than the amount

the defendants benefited and the amount of any consumer redress

award.  *FTC v. Onkyo U.S.A. Corp.*, No., 1995 WL 579811, at *4
n.6 (D.D.C. Aug. 21, 1995).

Defendants claim that if the Court imposes equitable
monetary relief, no civil penalty should be imposed.  This
argument treats civil penalties and equitable monetary relief as
mutually exclusive remedies.  This is simply not correct.  *See
Prochnow*, 2007 WL 3082139, at *3 (affirming order of district
court assessing civil penalties and disgorgement); *FTC v. PayDay
Fin. LLC*, No., 2013 WL 5442387, at *17 (D.S.D. Sept. 30, 2013)
(imposing disgorgement remedy, and postponing a determination on
an appropriate civil penalty until after trial); *FTC v.
Navestad*, No., 2012 WL 1014818, at *9 (W.D.N.Y. Mar. 23, 2012)
(entering judgment that included $20,000,000 in civil penalties
and $1,105,078.96 as disgorgement).  Therefore, the Court finds
that this factor weighs in favor of a substantial civil penalty.

### 4. A Civil Penalty Is Necessary to Vindicate the Authority of the FTC.

"Since the Commission has no plenary power to enforce its
own orders, it must enlist the aid of the federal district
courts for that purpose.  The penalty to be assessed must
therefore be a significant one." *FTC v. Consolidated Food
Corp.*, 396 F. Supp. 1353, 1357 (S.D.N.Y. 1975).  Defendants'
conduct has implications beyond this case.  As the court
described in *Mac's Muffler Shop*, "[i]f the regulated community

36

perceives that violations of the law are treated lightly, the government's regulatory program is subverted." *Mac's Muffler Shop, Inc.*, 1986 WL 15443 at *10.  If a penalty is "[t]o have any deterrent effect, [it] must be large enough to be more than just . . . an acceptable cost of doing business." *Onkyo U.S.A. Corp.*, 1995 WL 579811, at *4 n.6.  For the penalty award to provide meaningful deterrence, it "'should be large enough to hurt, and to deter anyone in the future from showing as little concern as [the defendants] did for the need to [comply].'" *United States v. Phelps Dodge Indus.*, 589 F. Supp. 1340, 1367 (S.D.N.Y. 1984) (*quoting United States v. Swingline, Inc.*, 371 F. Supp. 37, 47 (E.D.N.Y. 1974)); *United States v. ITT Continental Banking Co.*, 420 U.S. 223, 231-33 (1975).

The defendants have flouted the authority of the FTC, this Court and the D.C. Circuit by ignoring the FTC Order. Defendants continued to represent the Products as a treatment for cancer despite the FTC Order prohibiting them from doing so.  Even after receiving orders from this Court and the D.C. Circuit, the defendants continued to make unsubstantiated claims that the Products treat cancer.  Defendants' flagrant disregard for the FTC's authority merits a substantial penalty in order to

vindicate the United States' authority and deter future violations.

### 5. The Defendants Are Able to Pay a Civil Penalty.

Courts look at a variety of data points when assessing a defendant's ability to pay.  In *Danube Carpet Mills*, the Eleventh Circuit affirmed the district court's calculation of ability to pay based on the defendant's yearly profits and net worth, including both liquid and illiquid assets.  *Danube Carpet Mills, Inc.*, 737 F.2d at 994-95.  However, other courts considering this factor have looked beyond the funds and assets currently in a defendant's possession.  For example, in *United States v. Lasseter*, the district court imposed a civil penalty award after finding that the defendant received a "significant benefit" from the sale of his business, despite the defendant's assertion that he could not afford to pay a civil penalty because he was in Chapter 7 Bankruptcy.  *United States v. Lasseter*, 2005 WL 1638735, at *6 (M.D. Tenn June 30, 2005).

On November 11, 2012, the Court granted the United States' request for limited discovery concerning the defendants' ability to pay a civil penalty under the FTC Act.  While the defendants acknowledged possessing assets and funds totaling $2,001,959.73, the United States argued that discovery revealed that the defendants have dissipated approximately $2.7 million dollars of proceeds and assets since commencement of the lawsuit.  Pl.'s

Mot., ECF No. 10-24.  Specifically, the United States, very carefully, listed the defendants' assets and dissipated funds, which total $4,705.936.09.  *Id.*

The United States requests that this Court consider both the listed assets and the dissipated funds in determining whether the defendants can pay a civil penalty.  *Id.*  The defendants do not dispute that the discovery conducted in this case supports the United States' calculations.  *See generally* Defs.' Opp., ECF No. 70.  Further, the defendants fail to respond to the United States' argument that the Court should consider both listed assets and dissipated funds in reaching a determination on whether the defendants can pay a civil penalty. *Id.*  Thus, the defendants concede that the factual record, as detailed in the United States' motion, see Pl.'s Mot., ECF No. 19-24, including the United States' calculation of total assets and dissipated assets, is accurate and correct and that the Court should include the defendants' dissipated assets in determining the defendants' ability to pay a civil penalty. *McGinnis*, 2014 WL 4243542 at *15.  Even assuming, *arguendo*, that the defendants did dispute the inclusion of their dissipated assets in the overall calculation in determining the defendants' ability to pay a civil penalty, the Court will not allow the defendants to benefit from their blatant attempt to dissipate their assets during this litigation.  *See SEC v. Metcalf*, 2012

39

WL 5519358, at *8 (S.D.N.Y. Nov. 13, 2012) (discounting the defendants' claims of poverty where the defendant "knowing that he faced the very real possibility of civil financial penalties, chose to spend down his assets or failed to adjust his lifestyle").  Accordingly, the Court finds that the defendants' known assets and dissipated funds total $4,705,936.09.

Rather than dispute the factual record developed by the United States, the defendants make the following blanket statement, without providing any reliable evidence: "Defendants' financial resources have been dissipated by the need to pay attorneys' fees to defend against [criminal charges filed against defendants]."  *See* Defs' Supp., ECF No. 77 at 1. The defendants attempt to change previous discovery responses concerning its ability to pay by attaching an affidavit signed by Mr. Feijo.  The defendants' supplemental filing, among other things, violates the "sham affidavit rule," which precludes a party from creating an issue of material fact by contradicting prior sworn testimony "merely by pointing to a self-serving, contradictory declaration[.]"  *Glass v. Lahood*, 786 F. Supp. 2d 189, 216 (D.D.C. 2011) (*citing Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991)).  A party must "'offer persuasive reasons for believing the supposed

correction' is more accurate than the prior testimony." *Galvin v. Eli Lilly and Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting *Pyramid Sec. Ltd.*, 924 F.2d at 1123).

The defendants provide no evidence to support any statement contained in the declaration, from the revised bank account information, to the attorneys' fees paid, to the transfer of real property, to the value of their inventory.  The defendants could have easily provided evidentiary support.  For example, the defendants simply could have attached bank statements, receipts from their attorneys, charitable gift receipts, or other similar documents.  Instead, the defendants have provided absolutely no evidentiary support and have failed to "offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony." *Galvin*, 488 F.3d at 1030. Therefore, the Court will not consider the defendants' supplemental filing in determining the defendants' ability to pay a civil penalty.  In any event, the Court finds that the defendants' arguments raised in their supplemental filing unpersuasive because courts considering a defendant's ability to pay a civil penalty look beyond the funds and assets currently in the defendant's possession. *See e.g., Lasseter*, 2005 WL

1638735, at *6.  Accordingly, the Court finds that this factor
weighs in favor of a substantial civil penalty.

*****

Based on a careful consideration of each factor, the Court
determines that a civil penalty in the amount of $3,528,000 is
appropriate in this case.

## IV.   The Court Will Not Consider the Defendants' Cursory Eighth Amendment Argument.

The defendants raised the following cursory argument:
"Defendants respectfully submit that imposing a civil penalty of
$3,528,000 would violate the Eight Amendment's prohibition
against cruel and unusual punishment. *See United States v.
Bajakajian*, 524 U.S. 321, 336-37 (1998)."  *See* Defs.' Opp., ECF
No. 70 at 6.  That is the extent of the defendants' argument;
they do not articulate any basis to support their argument and
wholly fail to analyze *Bajakajian*.  Specifically, the defendants
do not address whether a civil penalty under the FTC Act is
punitive or remedial in nature and whether, assuming the civil
penalty is punitive and thus subject to the Eighth Amendment,
the civil penalty requested by the United States in this case is
"grossly disproportional to the gravity of [the] offense."
*Bajakajian*, 524 U.S. at 334.  The Court gave the defendants
every opportunity to supplement their opposition.  *See* October
6, 2014 Minute Order.  Because the defendants raised this issue

42

in "such a cursory fashion," the Court declines to resolve it.
*See Washington Legal Clinic for the Homeless v. Barry,* 107 F.3d
32, 39 (D.C. Cir. 1997); *Railway Labor Executives' Ass'n v.*
*United States R.R. Retirement Bd.,* 749 F.2d 856, 859 n.6 (D.C.
Cir. 1984) (declining to resolve issue "on the basis of briefing
which consisted of only three sentences . . . and no discussion
of the relevant statutory text, legislative history, or relevant
case law").

## V.    Conclusion

For the foregoing reasons, the Court hereby **GRANTS** the
United States' motion for entry of final judgment.  An
appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**SIGNED:    Emmet G. Sullivan**
**United States District Judge**
**March 31, 2015**

43